**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATHAN MICHAEL SMITH,<br>Captain, United States Army,<br>ISIS Operation Inherent Resolve,<br>Camp Arifjan, Kuwait<br><br>*Plaintiff*,<br><br>v.<br><br>BARACK H. OBAMA,<br>President of the United States<br>The White House<br>1600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20500<br><br>*Defendant*. | Civil Action No.<br><br>**COMPLAINT FOR DECLARATORY RELIEF** |

## NATURE OF THE CASE

### Summary

Nathan Michael Smith is a U.S. Army Captain deployed to the Kuwait headquarters of the Combined Joint Task Force-Operation Inherent Resolve, which commands all forces in support of the war against ISIS in Iraq and Syria. Captain Smith seeks a declaration that President Obama's war against ISIS is illegal because Congress has not authorized it. Under the 1973 War Powers Resolution, when the President introduces United States armed forces into hostilities, or into situations where hostilities are imminent, he must either get approval from Congress within sixty days to continue the operation, in the form of a declaration of war or specific statutory authorization, or he must terminate the operation within the thirty days after the sixty-day period has expired.

The President did not get Congress's approval for his war against ISIS in Iraq or Syria within the sixty days, but he also did not terminate the war. The war is therefore illegal. The Court should issue a declaration that the War Powers Resolution requires the President to obtain a declaration of war or specific authorization from Congress within sixty days of the judgment, and that his failure to do so will require the disengagement, within thirty days, of all United States armed forces from the war against ISIS in Iraq and Syria.

Captain Smith suffers legal injury because, to provide support for an illegal war, he must violate his oath to "preserve, protect, and defend the Constitution of the United States." *See Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804) ("A commander of a ship of war of the United States, in obeying his instructions from the President of the United States, acts at his peril. If those instructions are not strictly warranted by law he is answerable in damages to any person injured by their execution."), cited with approval in *Zivitovsky v. Kerry*, 135 S. Ct. 2076, 2090 (2015).

Finally, the Take Care clause required the President to publish a sustained legal justification, within the sixty-day period required by the War Powers Resolution, to enable Captain Smith to determine whether he can reconcile his military actions as an officer with his oath to "preserve, protect, and defend the Constitution of the United States." In contrast to past practice, the President has failed to publish an opinion prepared by the Justice Department's Office of Legal Counsel or the White House Counsel to justify the war against ISIS. He has instead left it to Administration spokespersons to provide ad hoc and ever-shifting legal justifications for a military campaign that is constantly changing its strategic objectives and escalating its use of force. This pattern of lawlessness is inconsistent with the President's obligation to "faithfully execute" the War Powers Resolution.

The 2001 Authorization for Use of Military Force ("2001 AUMF") does not authorize the war against ISIS. It authorized the President to wage war against those responsible for the attacks of September 11, 2001 – meaning Al Qaeda – and the governments which harbored it – meaning the Taliban. ISIS is in no way responsible for the September 11 attacks. The 2002 Iraq Authorization for Military Force ("2002 Iraq AUMF") also does not allow the President to wage the war against ISIS in Iraq: the war that Congress authorized the President to wage in Iraq is over. The Resolution does not even purport to cover military actions in Syria. The Administration has stated that it is obsolete, and should no longer relied on for military action in Iraq, and should be repealed.

Finally, the war exceeds the President's constitutional authority as "commander-in-chief" under Article II, section 2 of the Constitution. That authority does not override the War Powers Resolution's requirement that the President must obtain the consent of Congress within the time specified by the Resolution before committing the country to on-going war.

**THE PARTIES**

1. The plaintiff, U.S. Army Captain Nathan Michael Smith, is deployed to Kuwait as an intelligence officer at Camp Arifjan. He works in the headquarters of the commander of Combined Joint Task Force-Operation Inherent Resolve, who oversees the entire United States and Coalition counter-ISIS campaign in Iraq and Syria. Smith Declaration ¶ 2.

2. The defendant is President Barack Obama, the President of the United States. President Obama purported to authorize Operation Inherent Resolve.

**JURISDICTION AND VENUE**

3. This case arises under the Constitution and laws of the United States and presents a federal question within this Court's jurisdiction under Article III of the Constitution and 28

U.S.C. § 1331. The Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and authority to award costs and attorneys' fees under 28 U.S.C. § 2412. Venue is proper in this district under 28 U.S.C. § 1391(e).

## STATEMENT OF FACTS

### I. CAPTAIN SMITH FILED THIS LAWSUIT OUT OF CONSCIENCE BECAUSE FIGHTING AN ILLEGAL WAR FORCES HIM TO VIOLATE HIS OATH TO "PRESERVE, PROTECT, AND DEFEND" THE CONSTITUTION.

4. Captain Smith joined the military in 2010 because he believed that the United States military is a force for good in the world. With the people's representatives in Congress holding the keys to war and peace, he believed that his service as an officer would carry out the will of his fellow Americans. One of his proudest military assignments was in Afghanistan, where Congress had authorized the President to wage war. Smith Declaration ¶ 3 (attached as Exhibit A).

5. When President Obama ordered airstrikes in Iraq in August 2014, and in Syria in September 2014, Captain Smith was ready for action. He believes that the operation is justified both militarily and morally. He considers ISIS "an army of butchers," and believes that participation in the campaign against them "is what I signed up to be part of when I joined the military." Smith Decl. ¶¶ 4, 5.

6. Like his fellow soldiers at Camp Arifjan, Captain Smith closely follows the news. He reports: "while we were all cheering every airstrike and every setback for ISIS, I was also noticing that people at home were torn about whether President Obama should be carrying out this war without proper authorization from Congress. I began to wonder, 'Is this the Administration's war, or is it America's war?' The Constitution tells us that Congress is supposed to answer that question, but Congress is AWOL." Smith Decl. ¶ 6.

7. Captain Smith states, "My conscience bothered me. When I was commissioned by the President in May 2010, I took an oath to 'preserve, protect, and defend" the Constitution of the United States.' The Constitution gives Congress the power to declare war, and the War Powers Resolution prohibits the President from waging war without a declaration of war or specific statutory authorization." Captain Smith asked himself, "How could I honor my oath when I am fighting a war, even a good war, that the Constitution does not allow, or Congress has not approved?" To honor his oath, Captain Smith brought this lawsuit to ask the court "to tell the President that he must get proper authority from Congress, under the War Powers Resolution, to wage the war against ISIS in Iraq and Syria." Smith Decl. ¶ 7.

## II. THE WAR AGAINST ISIS IN IRAQ AND SYRIA IS ILLEGAL BECAUSE CONGRESS HAS NOT DECLARED WAR OR GIVEN THE PRESIDENT SPECIFIC STATUTORY AUTHORIZATION TO FIGHT IT, AS REQUIRED BY THE WAR POWERS RESOLUTION.

8. In waging war against ISIS, President Obama is misusing limited congressional authorizations for the use of military force as a blank check to conduct a war against enemies of his own choosing, without geographical or temporal boundaries. Congress passed the 1973 War Powers Resolution in response to just such presidential overreach in the Vietnam War, and to protect against such abuses of presidential power in the future.

### Gulf of Tonkin Resolution

9. On August 2, 1964, two U.S. destroyers stationed in the Gulf of Tonkin in Vietnam reported that they had been fired upon by North Vietnamese forces. On August 7, 1964, Congress passed and the President signed the Gulf of Tonkin Resolution. (The Tonkin Gulf Resolution is attached as Exhibit B.) Specifically directed at "the Communist regime in North Vietnam," the Resolution authorized the President "to take all necessary measures to repel any armed attack against the forces of the United States to prevent further aggression" and "to take

all necessary steps, including the use of armed force, to assist any member or protocol state of the Southeast Asia Collective Defense Treaty requesting assistance in defense of its freedom."

10. Presidents Lyndon B. Johnson and Richard M. Nixon used the Gulf of Tonkin Resolution as a blank check to expand the U.S. "police action" in Vietnam into a general "war against communism" in Indochina. Between March 1969 and May 1970, the United States extended the war to Laos and Thailand and conducted a "secret" campaign of carpet bombing in Cambodia, ostensibly directed against sanctuaries and base areas of the North Vietnam Army and the Vietcong. This "incursion" destabilized the neutral government of Prince Norodom Sihanouk and enabled the rise of the murderous Khmer Rouge.

11. As Presidents Johnson and Nixon expanded the Vietnam War, public opposition mounted. Congress responded by repealing the Tonkin Gulf Resolution in January 1971. The Nixon Administration was unimpressed on the ground that the President, as commander-in-chief, needed *no* congressional authorization for the use of military force. After repeal, President Nixon relied on his purported commander-in-chief power to continue the Vietnam War, unfettered by Congress, to its tragic conclusion in 1973.

**1973 War Powers Resolution**

12. On November 7, 1973, Congress enacted the War Powers Resolution to prevent such presidential overreaching from recurring, and to protect its own constitutional primacy in deciding whether and when to go to war. (The Resolution is attached as Exhibit C.) Congress declared its policy and purpose as follows:

> SEC. 2. (a) It is the purpose of this joint resolution to fulfill the intent of the framers of the Constitution of the United States and insure that the collective judgment of both the Congress and the President will apply to the introduction of United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, and to the continued use of such forces in hostilities or in such situations.

> (b) Under article I, section 8, of the Constitution, it is specifically provided that the Congress shall have the power to make all laws necessary and proper for carrying into execution, not only its own powers but also all other powers vested by the Constitution in the Government of the United States, or in any department or officer thereof.
>
> (c) The constitutional powers of the President as Commander-in-Chief to introduce United States Armed Forces into hostilities, or into situations where imminent involvement in hostilities is clearly indicated by the circumstances, are exercised only pursuant to (1) a declaration of war, (2) specific statutory authorization, or (3) a national emergency created by attack upon the United States, its territories or possessions, or its armed forces.

13. The Resolution provides that when the President introduces United States armed forces into hostilities, or into a situation involving imminent hostilities, he must submit a report to Congress on the matter within 48 hours. He is then obligated to obtain either a declaration of war or "a specific statutory authorization" for his continued use of force within sixty days after he submitted (or was required to submit) his report to Congress. If he fails to gain the consent of the House and Senate, he is obligated to withdraw his military forces within thirty days after the sixty-day period has expired.

14. President Nixon vetoed the Resolution. He asserted that it unconstitutionally terminated "certain of the President's constitutional powers as Commander in Chief of the Armed Forces 60 days after they were invoked." Congress nevertheless passed the Resolution over his veto.

15. Despite President Nixon's assertions of unconstitutionality, the Justice Department's Office of Legal Counsel issued a formal opinion in 1980 stating that the War Powers Resolution is constitutional:

> We believe that Congress may, as a general constitutional matter, place a 60-day limit on the use of our armed forces as required by the provisions of § 1544(b) of the Resolution. The Resolution gives the President the flexibility to extend that deadline for up to 30 days in cases of "unavoidable military necessity." This flexibility is, we believe, sufficient under any scenarios we can hypothesize to

> preserve his constitutional function as Commander-in-Chief. The practical effect of the 60-day limit is to shift the burden to the President to convince the Congress of the continuing need for the use of our armed forces abroad. We cannot say that placing that burden on the President unconstitutionally intrudes upon his executive powers.

Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization, 4A *Opinions of the Attorney General* 185, 196 (1980). (The Attorney General's Opinion is attached as Exhibit D.) In 2011, Senator Richard Lugar asked Harold Koh, then Legal Adviser of the State Department: "Does this opinion continue to reflect the views of the executive branch with regard to the constitutionality of section 1544(b) of the War Powers Resolution?" Adviser Koh replied: "Yes, the opinion continues to reflect the views of the executive branch." See Libya and War Powers, Hearing Before the Sen. Comm. on Foreign Relations, 112th Cong. 53 (2011) (responses of Legal Adviser Harold Koh to questions submitted by Senator Richard G. Lugar).

## III. THE PRESIDENT DOES NOT HAVE AUTHORITY TO WAGE THE WAR AGAINST ISIS UNDER THE 2001 AUMF, THE 2002 IRAQ AUMF, OR THE PRESIDENT'S COMMANDER-IN-CHIEF POWER.

16. President Obama introduced United States armed forces into situations involving "imminent hostilities" against ISIS in Iraq on August 8, 2014, https://www.gpo.gov/fdsys/pkg/DCPD-201400604/pdf/DCPD-201400604.pdf, and against ISIS in Syria on September 23, 2014, https://www.gpo.gov/fdsys/pkg/DCPD-201400697/pdf/DCPD-201400697.pdf .

17. President Obama has continued the use of the armed forces in hostilities in those countries for twenty months without having obtained from Congress either a declaration of war or "a specific statutory authorization" for its use.

18. Having acknowledged the constitutionality of the War Powers Resolution, the President nonetheless failed to publish an opinion from the Office of Legal Counsel or the White House Counsel explaining why his military actions past the ninety-day limit were consistent with

the Resolution. The White House has not even acknowledged that the OLC or the White House Counsel – the institutional arbiters of executive legality – were *asked* to prepare an opinion on this crucial issue. If the President has indeed failed to request their advice, this would represent a sharp break with past practice. It also would bespeak a strikingly cavalier disregard of the president's duty to "take care that the law be faithfully executed."

19. It is far more likely that the President sought an opinion but found the reasoning of the OLC or the White House Counsel so unpersuasive that its publication would have discredited his military campaign. In any event, the White House's failure to publish a serious legal justification for the war opened a vacuum which the Administration has sought to fill with ad hoc and ever-shifting legal justifications. This lawlessness has made it impossible for Captain Smith to determine whether his present mission is inconsistent with his oath to "preserve, protect and defend the Constitution of the United States," thus requiring him to seek an independent determination of this matter from the Court.

**2001 Authorization for Use of Military Force**

20. In response to the terrorist attacks of September 11, 2001, President Bush initially requested authority "*to deter and preempt* any future acts of terrorism or aggression against the United States." (Emphasis added.) *See* David Abramovitz, "The President, the Congress and the Use of Force," 43 *Harv. Intl. L. J.* 71, 73 (2002) (emphasis added) (Chief Counsel, House Committee on International Relations, House of Representatives, reporting on initial White House proposal.) But Congress refused to grant such authority precisely because it wanted to force future Presidents to return for specific authorization of further military initiatives. As Senator McCain put it, "the question is how do you fashion the language so that we don't have another "'Tonkin Gulf Resolution.'" Associated Press, "Senate OKs $40 Billion in Aid, Use of

Force" (Sept. 14, 2001). To answer that question, Congress passed and the President signed a much more limited Authorization for Use of Military Force ("2001 AUMF") (attached as Exhibit E).

21. The 2001 AUMF was directed at Al Qaeda, which "planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001," and at the Taliban, which "harbored" such organizations or persons. The 2001 AUMF's purpose was "to prevent any future acts of international terrorism against the United States by *such* nations, organizations or persons." (Emphasis added.) Congress specified that nothing in the Resolution "supercedes [sic] any requirement of the War Powers Resolution." President Obama's interpretation of the 2001 AUMF effectively converts it into the open-ended resolution that Congress deliberately rejected.

**2002 Iraq Authorization for Use of Military Force**

22. On October 16, 2002, President Bush signed into law the Authorization for Use of Military Force Resolution of 2002 ("2002 Iraq Resolution") (attached as Exhibit F). The Resolution granted the President specific authorization

> to use the Armed Forces of the United States to to use the Armed Forces of the United States as he determines to be necessary and appropriate in order to—
>
> (1) defend the national security of the United States against the continuing threat posed by Iraq; and
>
> (2) enforce all relevant United Nations Security Council resolutions regarding Iraq.

On July 25, 2014, the Administration declared to Congress that, "[w]ith American combat troops having completed their withdrawal from Iraq on December 18, 2011, the Iraq AUMF is no longer used for any U.S. government activities." Letter from Susan Rice, National Security Advisor, to Congress, July 25, 2014. (The letter is attached as Exhibit G.) Yet in the following

months, the Administration proceeded to invoke this Authorization to justify its war against ISIS, despite the fact that the 2002 AUMF explicitly provided that it did not "supersede[] any requirement of the War Powers Resolution."

23. Under Article II, section 2 of the Constitution, the President is "Commander in Chief of the Army and Navy of the United States." The President's commander-in-chief power, however, does not authorize him to initiate hostilities without a declaration of war or specific statutory authorization. President Obama is fighting a war against ISIS without a declaration of war or specific statutory authorization.

## CONSTITUTIONAL AND STATUTORY VIOLATIONS

### COUNT I

### (War Powers Resolution)

24. The War Powers Resolution provides that sixty days after the President has introduced United States armed forces into hostilities or into situations involving imminent hostilities, the President must obtain from Congress either a declaration of war or "a specific statutory authorization" for his use of force. If he fails to gain Congressional consent, the Resolution requires the President to withdraw the armed forces within thirty days.

25. President Obama introduced United States armed forces into situations involving "imminent hostilities" against ISIS in Iraq on August 8, 2014, and against ISIS in Syria on September 23, 2014. He has continued the use of United States armed forces in hostilities for twenty months without obtaining from Congress either a declaration of war or "a specific statutory authorization."

26. Wherefore, the President has violated the War Powers Resolution.

**COUNT II**

**(Take Care Clause)**

27. Article II, Section 3, clause 5 of the Constitution commands that the President "shall take Care that the Laws be faithfully executed."

28. The Take Care clause required President Obama to publish, within the sixty-day period specified by the War Powers Resolution, a sustained legal justification to enable Captain Smith to determine whether his military actions as an officer are consistent with his oath to "preserve, protect, and protect the Constitution of the United States."

29. The President failed to publish such a sustained legal justification.

30. Wherefore, the President has violated the Take Care clause of the Constitution.

**ACTIONS TAKEN IN EXCESS OF PRESIDENT'S AUTHORITY**

**COUNT III**

**(2001 AUMF)**

31. The 2001 AUMF authorized the President to wage war against those responsible for the attacks of September 11, 2001 and the governments which harbored it.

32. ISIS is in no way responsible for the September 11 attacks.

33. Wherefore, in exercising military force against ISIS, the President has exceeded his authority under the 2001 AUMF.

**COUNT IV**

**(2002 IRAQ AUMF)**

34. The 2002 Iraq AUMF authorized the President to use military force to "defend the national security of the United States against the continuing threat posed by Iraq."

35. The President's war against ISIS is not a use of military force to "defend the national security of the United States against [a] continuing threat posed by Iraq."

36. Moreover, the 2002 Iraq AUMF ceased to have effect when American combat troops completed their withdrawal from Iraq on December 18, 2011.

37. Wherefore, in exercising military force against ISIS after December 18, 2011, the President exceeded his authority under the 2002 Iraq AUMF.

**COUNT V**

**(Commander-in-Chief)**

38. Under Article II, section 2 of the Constitution, the President is "Commander in Chief of the Army and Navy of the United States."

39. The President's commander-in-chief power does not override his obligation under the War Powers Resolution to obtain from Congress a declaration of war or specific statutory authorization in order to wage the war against ISIS.

40. President Obama is fighting a war against ISIS without a declaration of war or specific statutory authorization.

41. Wherefore, the President's war against ISIS exceeds his authority as commander-in-chief.

**PRAYER FOR RELIEF**

Captain Smith respectfully requests that the court declare that the war against ISIS in Syria and Iraq violates the War Powers Resolution because the Congress has not declared war or given the President specific statutory authorization to fight the war, and violates the Take Care clause, and that if Congress does not declare war or give the President specific statutory authorization within sixty days of the judgment, the War Powers Resolution will require the disengagement, within thirty days, of all United States armed forces from the war against ISIS in

Iraq and Syria. Captain Smith also respectfully requests that the court award costs and attorneys' fees to Captain Smith's counsel under 28 U.S.C. § 2412.

Respectfully submitted,

David H. Remes

Bruce Ackerman
P.O. Box 208215
New Haven, CT 06520
(203) 432-0065
bruce.ackerman@yale.edu

David H. Remes
D.C. Bar No. 370372
Appeal for Justice
*A Human Rights and Civil Liberties Law Practice*
1106 Noyes Drive
Silver Spring, MD 20910
202-669-6508
remesdh@gmail.com

*Counsel for Plaintiff*