## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATHAN MICHAEL SMITH, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *v.* | ) | Civ. No. 16-843 (CKK) |
| | ) | |
| BARACK H. OBAMA, | ) | |
| | ) | |
| *Defendant.* | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 3

    I.      Operation Inherent Resolve ............................................................. 3

    II.     Congressional Action in Support of Operation Inherent Resolve ............. 8

          a.       Appropriations and Authorizations for Fiscal Year 2015............... 9

          b.       Appropriations and Authorizations for Fiscal Year 2016............. 12

    III.    Congressional Oversight Over Operation Inherent Resolve..................... 15

    IV.    The Complaint ......................................................................... 17

ARGUMENT ................................................................................................................ 18

    I.      The Complaint Seeks Resolution of a Non-Justiciable Political
          Question. ................................................................................. 20

          a.       Decisions Regarding the Use of American Military Forces
                 Are Committed Exclusively to the Political Branches. ............... 21

          b.       The Court Lacks Expertise and Judicially Manageable
                 Standards for Resolving Plaintiff's Claims................................... 30

    II.     Plaintiff Lacks Standing......................................................... 34

          a.       Plaintiff Has Not Asserted a Cognizable Injury in Fact. .............. 35

          b.       The Performance of Plaintiff's Official Duties Is Not
                 Inconsistent with His Oath and Thus Does Not Constitute a
                 Personal Injury. ......................................................................... 39

    III.    Plaintiff's Claims Are Also Barred by Sovereign Immunity.................... 41

    IV.    Plaintiff Cannot Obtain Equitable Relief Against the President............... 44

CONCLUSION ............................................................................................................. 45

# TABLE OF AUTHORITIES

CASES

*Abu Ali v. Ashcroft*,
 350 F. Supp. 2d 28 (D.D.C. 2004) ............................................................. 33

*Al Bihani v. Obama*,
 590 F.3d 866 (D.C. Cir. 2010) ................................................................... 6

*Al-Aulaqi v. Obama*,
 727 F. Supp. 2d 1 (D.D.C. 2010) ................................................ 19, 31, 32, 33

*Ali Jaber v. United States*,
 --- F. Supp. 3d ----, 2016 WL 706183 (D.D.C. Feb. 22, 2016) ................................. 19

*Allen v. Wright*,
 468 U.S. 737 (1984) .............................................................................. 19, 38

*Ange v. Bush*,
 752 F. Supp. 509 (D.D.C. 1990) ............................................................ 19, 21, 27

*Ashton v. United States*,
 404 F.2d 95 (8th Cir. 1968) ....................................................................... 35

*Atlee v. Laird*,
 347 F. Supp. 689 (E.D. Pa. 1972) ............................................................. 20

*Baker v. Carr*,
 369 U.S. 186 (1962) .......................................................................... passim

*Berk v. Laird*,
 429 F.2d 302 (2d Cir. 1970) .............................................................. 21, 22, 35

*Buaiz v. United States*,
 471 F. Supp. 2d 129 (D.D.C. 2007) ........................................................ 42

*Campbell v. Clinton*,
 203 F.3d 19 (D.C. Cir. 2000) .............................................................. 19, 32

*Chappell v. Wallace*,
 462 U.S. 296 (1983) ............................................................................. 45

*Chicago & S. Air Lines v. Waterman Corp.*,
 333 U.S. 103 (1948) ............................................................................. 31

*City of S. Lake Tahoe v. Cal.Tahoe Reg'l Planning Agency*,
 625 F.2d 231 (9th Cir. 1980) ....................................................... 36, 37, 38, 39

*Clapper v. Amnesty Int'l USA*,
 133 S. Ct. 1138 (2013) ........................................................................... 39

*Cole v. Richardson*,
 405 U.S. 676 (1972) ............................................................................. 39

*Crame v. Johnson*,
 783 F.3d 244 (5th Cir. 2015) ................................................................ 36

*Crockett v. Reagan*,
 558 F. Supp. 893 (D.D.C. 1982) ............................................... 20, 23, 24, 22

*DaCosta v. Laird*,
 471 F.2d 1146 (2d Cir. 1973) ....................................................... 20, 24, 30, 31

*DaCosta v. Laird*,
 448 F.2d 1368 (2nd Cir. 1971) ................................................................ 28

*Dellums v. Bush,*
    752 F. Supp. 1141 (D.D.C. 1990) ........................................................................ 24
*Doe v. Bush,*
    323 F.3d 133 (1st Cir. 2003) ............................................................................... 24
*Drake v. Obama,*
    664 F.3d 774 (9th Cir. 2011) .............................................................................. 36
*Drinan v. Nixon,*
    364 F. Supp. 854 (D. Mass. 1973) ...................................................................... 30
*El-Shifa Pharm. Indus. Co. v. United States,*
    378 F.3d 1346 (Fed. Cir. 2004) .......................................................................... 32
*El-Shifa Pharm. Indus. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) ............................................................... 19, 31, 32, 33
*Fleming v. Mohawk Wrecking & Lumber Co.,*
    331 U.S. 111 (1947) ...................................................................................... 28, 29
*Fletcher v. Peck,*
    10 U.S. (6 Cranch) 87 (1810) .............................................................................. 29
*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ...................................................................................... 42, 44
*Gilligan v. Morgan,*
    413 U.S. 1 (1973) ................................................................................................ 22
*Goldwater v. Carter,*
    444 U.S. 996 (1979) ............................................................................................ 24
*Harisiades v. Shaughnessy,*
    342 U.S. 580 (1952) ............................................................................................ 21
*Harrington v. Bush,*
    553 F.2d 190 (D.C. Cir. 1977) ....................................................................... 37, 38
*Holtzman v. Schlesinger,*
    484 F.2d 1307 (2d Cir. 1973) .............................................................. 20, 28, 30
*Industria Panificadora, S.A. v. United States,*
    763 F. Supp. 1154 (D.D.C. 1991) ....................................................................... 19
*INS v. Chadha,*
    462 U.S. 919 (1983) ............................................................................................ 27
*Japan Whaling Ass'n v. Am. Cetacean Soc'y,*
    478 U.S. 221 (1986) ............................................................................................ 20
*Jerome Stevens Pharm., Inc. v. FDA,*
    402 F.3d 1249 (D.C. Cir. 2005) .......................................................................... 18
*Kokkonen v. Guar. Life Ins. Co.,*
    511 U.S. 375 (1994) ............................................................................................ 18
*Kucinich v. Obama,*
    821 F. Supp. 2d 110 (D.D.C. 2011) .................................................................... 38
*KVOS, Inc. v. Assoc. Press,*
    299 U.S. 269 (1936) ............................................................................................ 18
*Lance v. Coffman,*
    549 U.S. 437 (2007) ............................................................................................ 35
*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949) ............................................................................................ 42

*Lowry v. Reagan,*
    676 F. Supp. 333 (D.D.C. 1987) ................................................................ 19, 23, 34
*Ludecke v. Watkins,*
    335 U.S. 160 (1948) .......................................................................................... 28
*Luftig v. McNamara,*
    373 F.2d 664 (D.C. Cir. 1967) .......................................................................... 22
*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..................................................................................... 35, 38
*Mahorner v. Bush,*
    224 F. Supp. 2d 48 (D.D.C. 2002) .................................................................... 19
*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803) ........................................................................... 29
*Massachusetts v. Laird,*
    451 F.2d 26 (1st Cir. 1971) ........................................................................ passim
*Mississippi v. Johnson,*
    71 U.S. (4 Wall.) 475 (1867) ............................................................................ 44
*Mitchell v. Laird,*
    488 F.2d 611 (D.C Cir. 1973) ................................................................. 20, 22, 45
*Ex parte Mitsuye Endo,*
    323 U.S. 283 (1944) .......................................................................................... 28
*Munaf v. Geren,*
    553 U.S. 674 (2008) .......................................................................................... 45
*New Jersey Peace Action v. Obama,*
    2009 WL 1416041 (D.N.J. 2009) ..................................................................... 37
*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ........................................................................ 44
*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) .......................................................................................... 44
*Orlando v. Laird,*
    443 F.2d 1039 (2nd Cir. 1971) ............................................................... 22, 23, 29
*Raines v. Byrd,*
    521 U.S. 811 (1997) ..................................................................................... 35, 38
*Rodearmel v. Clinton,*
    666 F. Supp. 2d 123 (D.D.C. 2009) .................................................................. 36
*Sanchez-Espinoza v. Reagan,*
    770 F.2d 202 (D.C. Cir. 1985) .................................................................... passim
*Sarnoff v. Connally,*
    457 F.2d 809 (9th Cir. 1972) ............................................................................ 20
*Schneider v. Kissinger,*
    412 F.3d 190 (D.C. Cir. 2005) .......................................................................... 21
*Smith v. Reagan,*
    844 F.2d 195 (4th Cir. 1988) ............................................................................ 34
*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ........................................................................ 34, 35, 37, 39
*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ..................................................................... 42, 44

*Thomas v. Mundell*,
   572 F.3d 756 (9th Cir. 2009) ............................................................... 36, 37
*Tri-State Hosp. Supply Corp. v. United States*,
   341 F.3d 571 (D.C. Cir. 2003) ................................................................... 41
*United States ex rel. New v. Rumsfeld*,
   350 F. Supp. 2d 80 (D.D.C. 2004) ....................................................... 21, 24
*United States v. Berrigan*,
   283 F. Supp. 336 (D. Md. 1968) ................................................................ 40
*United States v. Caceras*,
   440 U.S. 741 (1979) ................................................................................... 33
*United States v. Huet-Vaughn*,
   43 M.J. 105 (C.A.A.F. 1995) ..................................................................... 40
*United States v. Mitchell*,
   463 U.S. 206 (1983) ................................................................................... 41
*United States v. Munoz-Flores*,
   495 U.S. 385 (1990) ................................................................................... 20
*United States v. New*,
   55 M.J. 95 (C.A.A.F. 2001) ....................................................................... 41
*United States v. New*,
   55 M.J.  (C.A.A.F. 2001) ........................................................................... 39
*United States v. Stanley*,
   483 U.S. 669 (1987) ................................................................................... 45
*Valley Forge Christian Coll. v. Americans United for Separation of Church &
   State, Inc.*,
   454 U.S. 464 (1982) ................................................................................... 37
*Williams v. Lew*,
   819 F.3d 466 (D.C. Cir. 2016) ................................................................... 18
*Wilton v. Seven Falls Co.*,
   515 U.S. 277 (1995) ................................................................................... 45

STATUTES

5 U.S.C. app. § 8L ................................................................................... 8, 26
5 U.S.C. § 702 ............................................................................................ 42
10 U.S.C. § 101 ............................................................................................ 8
28 U.S.C. § 2201-2202 ............................................................................... 42
50 U.S.C. § 1544 ............................................................................. 18, 27, 29
50 U.S.C. § 1543 ........................................................................................ 18

RULES

Fed. R. Civ. P. 12 ......................................................................................... 1
Fed. R. Evid. 201 ....................................................................................... 18

UNITED STATES CONSTITUTION

U.S. Const. art. III, §2 ............................................................................... 19

OTHER AUTHORITIES

Captain Robert E. Murdough, "I Won't Participate in an Illegal War": Military
   Objectors, the Nuremberg Defense, and the Obligation to Refuse Illegal Orders
   Army Law., July 2010 ............................................................................... 40

Department of Defense, Law of War Manual § 18.3.2.1 .................................................. 40
Pub. L. No. 107-40 .................................................................................... 5, 31, 32
Pub. L. No. 107-243 .......................................................................................... passim
Pub. L. No. 112-81 ................................................................................................... 6
Pub. L. No. 113-114 (2015) ................................................................................... 13
Pub. L. No. 113-235 .......................................................................................... passim
Pub. L. No. 113-291 .......................................................................................... passim
Pub. L. No. 114-92 ............................................................................................ passim
Pub. L. No. 114-113 .......................................................................................... passim
The Administration's Strategy and Military Campaign Against Islamic State in
    Iraq and the Levant: Hearing Before the H. Comm. on Armed Services,
    113th Cong. (Nov. 2014) ............................................................................... 17
U.S. Policy Towards Iraq and Syria and the Threat Posed by the Islamic Stateof
    Iraw and the Levant (ISIL): Hearing Before the S. Comm. On Armed Services,
    113th Cong. (Sept. 2014) ............................................................................... 17

**INTRODUCTION**

Since the enactment of the War Powers Resolution in 1973, nearly every President has committed U.S. armed forces into combat operations overseas. Many of these deployments have prompted lawsuits seeking judicial determinations of the scope of the War Powers Resolution and the constitutional division of war powers between Congress and the President. Not one of these suits has prevailed, and virtually all of them have been dismissed on jurisdictional grounds. The fate of this lawsuit should be no different.

Plaintiff is a U.S. Army captain deployed to Kuwait as part of Operation Inherent Resolve, the military's counterterrorism campaign against the Islamic State of Iraq and the Levant (ISIL). Plaintiff has sued the President, seeking a declaration that the War Powers Resolution requires the removal of U.S. armed forces from hostilities in Iraq and Syria unless the President gets more specific approval from Congress to continue the operation. Although Plaintiff readily concedes that the Constitution vests significant authority in Congress with respect to the President's authority to conduct military operations overseas, he would have the Court assume that judicial intervention is warranted in this case because Congress is "AWOL" and supposedly unwilling to protect its constitutional interests. That assumption—the very basis of this suit—is wrong, and this Court lacks jurisdiction to consider Plaintiff's claims, for several reasons. *See* Fed. R. Civ. P. 12(b)(1).

First, the political question doctrine bars review of Plaintiff's claims. The Constitution leaves it to the political branches to decide, generally through the give and take of the political process, under what circumstances the President can use military

1

force overseas.  Courts repeatedly have refused to intrude on this process by declining to entertain challenges to whether the executive may deploy forces abroad, and even those courts that have not categorically foreclosed such challenges have recognized that judicial review is inappropriate absent a clear conflict between the political branches over the President's authority to act.

There is no such conflict here.  The President has determined that he has the authority to take military action against ISIL, and Congress has ratified that determination by appropriating billions of dollars in support of the military operation. Congress has made these funds available over the course of two budget cycles, in connection with close oversight of the operation's progress, and with knowledge of the authority under which the operation is being conducted.  The political branches have exercised their respective constitutional roles, and their joint effort in support of Operation Inherent Resolve is precisely the kind of mutual participation that courts have looked to in dismissing war powers challenges under the political question doctrine.

The political question doctrine bars judicial review for the additional reason that consideration of these claims would insert the judiciary into an area of decision-making where courts are particularly ill-equipped to venture.  To resolve this challenge, the Court not only would have to pass judgment on the President's determination that ISIL is an authorized military target, but it would have to do so in the midst of a live armed conflict, without the relevant expertise or access to the type of information necessary to render an informed decision, and without judicial standards to govern its analysis.  Courts consistently have found that they are not equipped to make such judgments.

Second, Plaintiff lacks standing to bring this suit.  Under established Article III standing requirements, a litigant's injury cannot be based on the public's generalized interest in enforcing adherence to the Constitution, and courts repeatedly have rejected the proposition that swearing an oath to support and defend the Constitution can transform such a generalized interest into a concrete harm.  And even if this theory of standing were viable, Plaintiff cannot show that performing his official duties has forced him to violate his oath.

Finally, even assuming Plaintiff could overcome these justiciability hurdles, there is no waiver of sovereign immunity that would allow his claims to proceed.  Further, the relief Plaintiff seeks—a declaratory judgment against the President—is not available, particularly in a case involving a challenge to the lawfulness of the President's use of military force overseas.

## STATEMENT OF FACTS

## I.    Operation Inherent Resolve

In September of 2014, President Obama announced a "comprehensive and sustained counterterrorism strategy" "to degrade and ultimately destroy the terrorist group known as ISIL."[1]  The President explained that ISIL, formerly al Qaeda in Iraq, recently had "taken advantage of sectarian strife and Syria's civil war to gain territory on both sides of the Iraq-Syrian border."[2]  The President said the U.S. counterterrorism strategy would include "a systematic campaign of airstrikes" against ISIL targets in Syria and Iraq, as well as U.S. military assistance to Iraqi forces and Syrian opposition forces

---

[1]  President Barack Obama, Statement by the President on ISIL (Sept. 10, 2014), https://www.gpo.gov/fdsys/pkg/DCPD-201400654/pdf/DCPD-201400654.pdf.
[2]  Statement by the President on ISIL, *supra* note 1.

fighting ISIL on the ground.[3]   The President confirmed that he had "secured bipartisan support for this approach here at home," that he "ha[s] the authority to address the threat from ISIL," and that he "welcome[s] congressional support for this effort in order to show the world that Americans are united in confronting this danger."[4]

Later that month, the President sent a letter to congressional leaders providing additional details about the scope of the military operations against ISIL and the legal basis for carrying them out.[5]   The letter advised that, "with a new Iraqi government in place, and following consultation with allies abroad and the Congress at home," the President had "ordered the U.S. Armed Forces to conduct a systematic campaign of airstrikes and other necessary actions against [ISIL] in Iraq and Syria."[6]   These military activities were "being undertaken in coordination with and at the request of the Government of Iraq and in conjunction with coalition partners."[7]   The President noted, as he had in several previous letters reporting on U.S. airstrikes against ISIL,[8] that the

---

[3] *Id.*

[4] *Id.*

[5]   Letter from President Barack Obama to the Speaker of the House of Representatives and the President pro tempore of the Senate (Sept. 23, 2014), https://www.gpo.gov/fdsys/pkg/DCPD-201400697/pdf/DCPD-201400697.pdf; *see also* Compl. ¶ 16.

[6] *Id.*

[7] *Id.*

[8]   The President had written to Congress on August 8, August 17, September 1, and September 8 of 2014 to report on specific instances in which he ordered military actions against ISIL.   Each letter explained the circumstances and the estimated scope and duration of U.S. involvement and stated that the President was acting pursuant to, *inter alia*, his constitutional authority as Commander in Chief and Chief Executive.   Letter from President Obama to the Speaker of the House of Representatives and the President Pro Tempore of the Senate (Aug. 8, 2014), https://www.gpo.gov/fdsys/pkg/DCPD-201400604/pdf/DCPD-201400604.pdf; Letter from President Obama to the Speaker of the House of Representatives and the President Pro Tempore of the Senate (Aug. 17, 2014), https://www.gpo.gov/fdsys/pkg/DCPD-201400614/pdf/DCPD-201400614.pdf; Letter from President Obama to the Speaker of the House of Representatives and the

September 23rd letter was "part of [his] efforts to keep the Congress fully informed, consistent with the War Powers Resolution."[9]   The President advised congressional leaders that he ordered these actions "pursuant to [his] constitutional and statutory authority as Commander in Chief (including the authority to carry out Public Law 107-40 and Public Law 107-243)," his authority as Chief Executive, and his "constitutional and statutory authority to conduct the foreign relations of the United States."[10]

The two statutes the President cited as legislative authority for military action against ISIL, Public Law 107-40 and Public Law 107-243, are congressional authorizations for the use of military force.  Each statute constitutes a "specific statutory authorization" for the use of force in accordance with the War Powers Resolution. Authorization for Use of Military Force, Pub. L. No. 107-40, § 2(b)(1), 115 Stat. 224, 224 (2001) (2001 AUMF); Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, § 3(c)(1), 116 Stat. 1498, 1501 (2002 AUMF).

The 2001 AUMF, enacted in response to the terrorist attacks of September 11, 2001, authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons."  Pub. L. No. 107-40, § 2(a),

---

President Pro Tempore of the Senate (Sept. 1, 2014), https://www.gpo.gov/fdsys/pkg/ DCPD-201400637/pdf/DCPD-201400637.pdf; Letter from President Obama to the Speaker of the House of Representatives and the President Pro Tempore of the Senate (Sept. 8, 2014), https://www.gpo.gov/fdsys/pkg/DCPD-201400650/pdf/DCPD-201400 650.pdf; *see also* Compl. ¶ 16 (referencing the Aug. 8 letter).

[9] Letter from President Obama, *supra* note 5.

[10] *Id.*

115 Stat. at 224.  Congress did not enumerate the "nations, organizations, or persons" to which the 2001 AUMF applies.  Instead, Congress explicitly authorized the President to make such determinations.

The 2001 AUMF clearly covers Usama bin Laden and al Qaeda, and Congress and the federal courts have confirmed the Executive Branch's view that the statute also provides authority for counterterrorism actions against persons who were a part of or substantially supported al Qaeda, the Taliban, or associated forces "engaged in hostilities against the United States or its coalition partners, including any person who committed a belligerent act, or has directly supported such hostilities in aid of such enemy forces," without limiting that authority to any particular foreign country.  National Defense Authorization Act for Fiscal Year 2012, § 1021(b), Pub. L. No. 112-81, 125 Stat. 1298, 1562 (2011); *see also Al Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir. 2010).

Pursuant to the 2001 AUMF, the United States has carried out military operations against al Qaeda's affiliate in Syria, the al-Nusrah Front, including the group of seasoned al Qaeda operatives known as the Khorasan Group.[11]  U.S. armed forces also have resumed operations in Iraq and Syria against ISIL, a terrorist group the United States fought in Iraq from 2004 to 2011.  The 2001 AUMF has authorized the use of force against ISIL beginning in at least 2004, when ISIL, then known as al Qaeda in Iraq ("AQI"), joined bin Laden's al Qaeda organization in its conflict against the United States.  AQI had a direct relationship with bin Laden, and waged that conflict in

---

[11] Stephen W. Preston, General Counsel, U.S. Dep't of Defense, The Legal Framework for the United States' Use of Military Force Since 9/11, Address to the Annual Meeting of the American Society of International Law (Apr. 10, 2015) [hereinafter Preston Speech], http://www.defense.gov/News/Speeches/Speech-View/Article/606662.

allegiance to him while he was alive.[12]   ISIL continues to plot and carry out attacks against the United States and specifically continues "to denounce the United States as its enemy and to target U.S. citizens and interests."[13]   For those reasons, the Executive Branch has concluded that ISIL's recent disagreements with and split from the current al Qaeda leadership does not remove it from coverage by the 2001 AUMF:   the enemy cannot "control the scope of the AUMF by splintering into rival factions while continuing to prosecute the same conflict against the United States . . . .   The name may have changed, but the group we call ISIL today has been an enemy of the United States within the scope of the 2001 AUMF continuously since at least 2004."[14]

The 2002 AUMF, also cited by the President as legislative authority for targeting ISIL in his letter of September 23, 2014, authorizes the President to "use the Armed Forces of the United States as he determines to be necessary and appropriate in order to defend the national security of the United States against the continuing threat posed by Iraq."   Pub. L. No. 107-243, § 3, 116 Stat. at 1501.   The 2002 AUMF reinforces the President's authority to use military force against ISIL.   The Executive Branch has explained that, "[a]lthough the threat posed by Saddam Hussein's regime in Iraq was the primary focus of the 2002 AUMF, the statute, in accordance with its express goals, has always been understood to authorize the use of force for the related purposes of helping to establish a stable, democratic Iraq and addressing terrorist threats emanating from Iraq."[15]   Even after Saddam Hussein's regime fell in 2003, the United States "continued to take military action in Iraq under the 2002 AUMF," "including action against AQI,

---

[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

which then, as now, posed a terrorist threat to the United States and its partners and undermined stability and democracy in Iraq."[16]  Congress ratified this understanding of the 2002 AUMF by appropriating billions of dollars to support continued military operations in Iraq between 2003 and 2011.   Accordingly, the Executive Branch has concluded that the "2002 AUMF authorizes military operations against ISIL in Iraq and, to the extent necessary to achieve these purposes, in Syria."[17]

## II.     Congressional Action in Support of Operation Inherent Resolve

In October 2014, the Department of Defense designated military operations in Iraq and Syria against ISIL as Operation Inherent Resolve.[18]   The operation was designated by the Secretary of Defense as an "overseas contingency operation,"[19] which is a military operation "in which members of the armed forces are, or may become, involved in military actions, operations, or hostilities against an enemy of the United States or against an opposing military force."   10 U.S.C. § 101(a)(13)(A).   Overseas contingency operations (OCOs) are funded as part of the annual budget process, and operations lasting longer than sixty days are subject to additional, enhanced oversight by inspectors general who issue periodic reports to Congress.  5 U.S.C. app. § 8L.

---

[16] *Id*.

[17] *Id*.

[18] U.S. Dep't of Defense, Centcom Designates Ops Against ISIL as "Inherent Resolve" (Oct. 15, 2014), http://www.defense.gov/News-Article-View/Article/603462.   "The operation name applies retroactively to U.S. military actions conducted against ISIL in Iraq and Syria since airstrikes against ISIL began Aug. 8 in Iraq."  *Id*.

[19] Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve: Quarterly and Biannual Report to the United States Congress 12 (Mar. 31, 2015), http://www.dodig.mil/IGInformation/archives/OperationInherentResolveQuarterly Report_Print_042015.pdf.

### a.  Appropriations and Authorizations for Fiscal Year 2015

In a November 2014 letter to Congress, the President amended his Fiscal Year 2015 Budget to request funds to support Operation Inherent Resolve.  In light of the Administration's "evolv[ing] approach to counter ISIL," the President asked Congress for "$5.6 billion for OCO activities to degrade and ultimately defeat the Islamic State of Iraq and the Levant (ISIL)—including military operations as part of Operation Inherent Resolve."[20]  An accompanying  letter from the Director of the Office of Management and Budget reiterated that "[t]he purpose of these amendments is to provide the resources needed to support [President Obama's] comprehensive strategy to degrade, and ultimately defeat, [ISIL], including military operations associated with Operation Inherent Resolve."[21]  The OMB Director's letter explained that the requested funding would be used to conduct a range of military operations against ISIL, and specifically asked for appropriations for activities such as "training, advice, and assistance to partner security forces engaged in the fight against ISIL"; support for "intelligence, surveillance, and reconnaissance platforms" that are essential for counterterrorism operations; "replenishing or replacing munitions expended while conducting airstrikes against ISIL"; and "operations and maintenance costs for air, ground, and naval operations."[22]

While Congress was considering this budget request, the President submitted a six-month consolidated report "as part of [his] efforts to keep the Congress informed about deployments of U.S. Armed Forces equipped for combat," "consistent with the

---

[20] Letter from President Obama to the Speaker of the House of Representatives 1 (Nov. 10, 2014), https://www.whitehouse.gov/sites/default/files/omb/assets/budget_amendments/amendment_11_10_14.pdf.
[21] *Id.* at 2.
[22]  *Id.*

War Powers Resolution."[23]   The President confirmed that "[he] authorized, earlier this year, the deployment of U.S. forces . . . [who] are conducting coordination with Iraqi forces and providing training, communications support, intelligence support, and other support to select elements of the Iraqi security forces, including Kurdish Peshmerga forces."[24]   And the President repeated that "[U.S.] forces are conducting a systematic campaign of airstrikes and other necessary actions against ISIL forces in Iraq and Syria and airstrikes against elements of al Qa'ida known as the Khorasan Group in Syria."[25]

Shortly thereafter, in December 2014, Congress passed the Consolidated and Further Continuing Appropriations Act of 2015.  Pub. L. No. 113-235, 128 Stat. 2130 (2014) ("2015 Appropriations Act").  A general provision of the 2015 Appropriations Act clarified that "[n]one of the funds made available by this Act may be used in contravention of the War Powers Resolution."  *Id.* § 8116, 128 Stat. at 2280.  In the same measure, Congress appropriated the additional $5.6 billion that the President sought for overseas contingency operations to counter ISIL, including Operation Inherent Resolve, in virtually identical categories and amounts that the President had asked for in his November 10, 2014 letter.  128 Stat. at 2285-95.

In addition to funding for military personnel, operation and maintenance activities, procurement, and research, the 2015 Appropriations Act granted the President's request for $1.6 billion for the "Iraq Train and Equip Fund" to provide "assistance, including training; equipment; logistics support, supplies, and services;

---

[23] Letter from President Obama to the Speaker of the House of Representatives and the President pro tempore of the Senate (Dec. 11, 2014), https://www.gpo.gov/fdsys/pkg/DCPD-201400920/pdf/DCPD-201400920.pdf.
[24] *Id.*
[25] *Id*.

stipends; infrastructure repair, renovation, and sustainment to military and other security forces of or associated with the Government of Iraq, including Kurdish and tribal security forces or other local security forces, with a national security mission, to counter [ISIL]." 128 Stat. at 2290.  The National Defense Authorization Act for Fiscal Year 2015, enacted a few days later, authorized the Secretary of Defense, in coordination with the Secretary of State, to provide such assistance to military and security forces associated with the Government of Iraq to "[d]efend[] Iraq, its people, allies, and partner nations from the threat posed by [ISIL]" and to "[s]ecur[e] the territory of Iraq."  Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, § 1236(a), Pub. L. No. 113-291, 128 Stat. 3292, 2559 (2014) ("2015 NDAA").

The 2015 NDAA also authorized the Secretaries of Defense and State to provide assistance to appropriately vetted elements of the Syrian opposition for the purposes of "[d]efending the Syrian people from attacks by [ISIL]," "[p]rotecting the United States, its friends and allies, and the Syrian people from the threats posed by terrorists in Syria," and "[p]romoting the conditions for a negotiated settlement to end the conflict in Syria." *Id.* § 1209(a), 128 Stat. at 3541.  Congress clarified that none of the funds provided for Operation Inherent Resolve could be used for the introduction of U.S. forces into Iraq or Syria in contravention of the War Powers Resolution, and particularly the Resolution's consultation and reporting requirements.[26]   *Id.* § 8140, 128 Stat. at 2285 (Iraq); *id.* § 9014, 128 Stat. at 2300 (Syria).

---

[26] Specifically, the provision prohibited the use of appropriations "with respect to Iraq in contravention of the War Powers Resolution," "including for the introduction of United States armed forces into hostilities in Iraq, into situations in Iraq where imminent involvement in hostilities is clearly indicated by the circumstances, or into Iraqi territory, airspace, or waters while equipped for combat, in contravention of the congressional

### b.  Appropriations and Authorizations for Fiscal Year 2016

In February 2015, in his proposed budget for fiscal year 2016,[27] the President again requested appropriations to conduct specific military activities in connection with Operation Inherent Resolve—including to pay for personnel, for operation and maintenance activities, for payments to reimburse cooperating nations for their support of "United States military and stability operations in Afghanistan and Iraq to counter [ISIL]," and to fund procurement requests for aircraft, missiles, and ammunition "to replace equipment worn out by combat operations or lost in battle."[28]

While Congress considered the Administration's 2016 budget request, the President submitted two more reports "consistent with the War Powers Resolution."[29]  In the first, the President reported that "U.S. forces are conducting a systematic campaign of airstrikes and other necessary actions against ISIL forces in Iraq and Syria," as well as "airstrikes in Syria against operatives of al-Qa'ida . . . known as the Khorasan Group, who are involved in al-Qa'ida's plotting against the West."[30]  The President's next report, in December 2015, again described the U.S. airstrikes against ISIL in Iraq and Syria.[31] The President informed Congress that "U.S. forces are advising and coordinating with

---

consultation and reporting requirements of sections 3 and 4 of such resolution."  2015 NDAA, § 8140, 128 Stat. at 2285.  Congress enacted an identical provision with respect to Syria.  *Id.* § 9014, 128 Stat. at 2300.

[27] Office of Mgmt. & Budget, Exec. Office of the President, Appendix: Budget of the U.S. Government Fiscal Year 2016 (2015) [hereinafter 2016 Budget], https://www.whitehouse.gov/sites/default/files/omb/budget/fy2016/assets/appendix.pdf.

[28] *Id.* at 312-13, 318, 319-39.

[29] Letter from President Obama to the Speaker of the House of Representatives and the President pro tempore of the Senate (June 11, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500428/pdf/DCPD-201500428.pdf.

[30] *Id.*

[31] Letter from President Obama to the Speaker of the House of Representatives and the President pro tempore of the Senate (Dec. 11, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500883/pdf/DCPD-201500883.pdf.

Iraqi forces and providing training, equipment, communications support, intelligence support, and other support to select elements of the Iraqi security forces, including Iraqi Kurdish Peshmerga forces."[32]   The President also described a specific operation in which "U.S. Armed Forces supported an Iraqi Kurdish Peshmerga operation to rescue hostages at an ISIL detention facility near Hawijah, Iraq," explaining that "U.S. Armed Forces remain postured to support or conduct further similar operations in Iraq and Syria."[33]

One week after receiving that letter, Congress passed the Consolidated Appropriations Act, 2016. Pub. L. No. 114-113, 129 Stat. 2242 (2015) ("2016 Appropriations Act").   As with the 2015 Act, the 2016 Appropriations Act directed that "[n]one of the funds made available by this Act may be used with respect to Iraq in contravention of the War Powers Resolution . . . , in contravention of the congressional consultation and reporting requirements of sections 3 and 4 of such Resolution," *id.* § 8122, 129 Stat. at 2380, and provided the same for Syria, *id.* § 9019, 129 Stat. at 2397. The 2016 Act appropriated $5 billion of the $5.3 billion that the President had requested.[34]   The Explanatory Statement for the Act highlighted the threat posed by the "rise of [ISIL]," and noted that the Act "moves funding from the base appropriation to the [overseas contingency operations] appropriation to provide additional funding for the

---

[32] *Id.*

[33] *Id.*

[34] The difference resulted from a temporary congressional hold on funds for the Syria Train and Equip Program in light of the Department of Defense's suspension of certain elements of the Syria Train and Equip Program in 2015.   *See* Consolidated Appropriations Act, 2016 Committee Print of the H. Comm. on Appropriations, Explanatory Statement at 566, Pub. L. No. 113-114 (2015) [hereinafter 2016 Appropriations Explanatory Statement], https://www.gpo.gov/fdsys/pkg/CPRT-114 HPRT98155/pdf/CPRT-114HPRT98155.pdf.   Those holds have now been released.

Army, Navy, Marine Corps, and Air Force to conduct counter-ISIL operations . . . ."
2016 Appropriations Act Explanatory Statement at 289.

Congress reiterated its support for action against ISIL in the National Defense Authorization Act for Fiscal Year 2016 (2016 NDAA), which set forth "the sense of the Congress that . . . [ISIL] poses an acute threat to the people and territorial integrity of Iraq" and that "defeating ISIL is critical to maintaining a unified Iraq."  Pub. L. No. 114-92, §§ 1223, 1224, 129 Stat. 726, 1049, 1053 (2015) (2016 NDAA).   Congress also amended the longstanding Commander's Emergency Response Program to include authority to make "*ex gratia* payments for damage, personal injury, or death that is incident to combat operations of the Armed Forces in Iraq."  *Id.* § 1211(d)(1), 129 Stat. at 1042.  In its Joint Explanatory Statement, Congress addressed an inventory requirement for Air Force fighter aircraft by acknowledging the "ongoing and anticipated operations in Iraq and Syria against [ISIL]" and deciding that "reductions in fighter force capacity below" pose "excessive risk to the Air Force's ability to execute the National Defense Strategy . . . ."[35]

On June 13, 2016, the President sent Congress another six-month report "consistent with the War Powers Resolution."[36]  Once again, that report explains that the "deployments of U.S. forces . . . are conducting a systematic campaign of airstrikes and

---

[35] 2016 NDAA Joint Explanatory Statement, Pub. L. No. 114-92, at 614, https://www.gpo.gov/fdsys/pkg/CPRT-114JPRT97637/pdf/CPRT-114JPRT97637.pdf.
[36] Letter from President Obama to the Speaker of the House of Representatives and the President pro tempore of the Senate (June 13, 2016), https://www.whitehouse.gov/the-press-office/2016/06/13/letter-president-war-powers-resolution.

other necessary actions against ISIL forces in Iraq and Syria" and "airstrikes in Syria against operatives of al-Qa'ida."[37]

### III.    Congressional Oversight Over Operation Inherent Resolve

In conjunction with the enactment of appropriations and authorizing legislation relating to Operation Inherent Resolve, Congress has continued to exercise oversight over the military operation and its execution.   Congress receives monthly reports on incremental contingency operations costs for Inherent Resolve.  2015 Appropriations Act, § 8097, 128 Stat. at 2276; 2016 Appropriations Act, § 8093, 129 Stat. at 2373.  Congress receives quarterly reports "on United States Armed Forces deployed in support of Operation Inherent Resolve," including the "total number of members," estimates for future deployment, and "[a] description of the authorities and limitations on the number of United States Armed Forces deployed in support" of the operation.  2016 NDAA, § 1224, 129 Stat. at 1053.  Congress also receives quarterly reports from the Lead Inspector General for Operation Inherent Resolve (OIR IG), an independent investigative official charged with audits, inspections, and investigations regarding the Operation.[38]  These reports provide Congress with detailed accounts of the operation as well as regular updates on the use of appropriated funds.[39]

Congress also has taken steps to oversee the component of the U.S. counter-ISIL strategy that involves providing military support to Iraqi forces and Syrian opposition

---

[37] *Id.*

[38] Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the U.S. Congress (Mar. 31, 2016) at ii, https://oig.state.gov /system/files/oir_quarterly_march2016.pdf. The OIR IG shares oversight responsibility with partner oversight agencies, including audit agencies from the Army and Air Force, the Government Accountability Office, and the inspectors general of the Department of Defense, State, and the U.S. Agency for International Development.  *Id.* at 116-22.

[39] *See, e.g.*, *id.*

forces fighting ISIL on the ground.  For example, Congress required notice and a report from the Secretary of Defense, in coordination with the Secretary of State, before any assistance to elements of the Syrian opposition could be provided.  2015 NDAA, § 1209(b), 128 Stat. at 3541.  That report contained "the plan for providing such assistance," including the goals and objectives of assistance, the concept of operations, and "any additional military support and sustainment activities."  *Id.* § 1209(b), (c).  The report also contained "the requirements and process used to determine appropriately vetted recipients" and "the mechanisms and procedures that will be used to monitor and report" unauthorized end-use of training and equipment by certain recipients.  *Id.* § 1209(b)(1).  In addition, Congress requires detailed quarterly progress reports on U.S. military assistance provided to vetted Syrian opposition forces, including updates to the plan, strategy, or vetting process, and on a number of other issues, including "a description of how the threat of attacks against United States or coalition personnel is being mitigated."  *Id.* § 1209(d).[40]

Similarly, prior to obligating or spending more than 25 percent of the  "Iraq Train and Equip Fund" to provide assistance to Iraqi security forces engaged in countering the threat posed by ISIL, the Secretary of Defense, in coordination with the Secretary of State, is to submit to congressional leaders and appropriate committees a detailed report that includes the goals and objectives of assistance, the concept of operations, the number of U.S. armed forces personnel involved, and other information.  2015 NDAA, § 1236,

---

[40] Congress imposed additional reporting requirements in the 2016 NDAA.  2016 NDAA, § 1225, 129 Stat. at 1054 (adding, among other things, a requirement that the quarterly reports submitted pursuant to section 1209(d) of the 2015 NDAA include a description of any "logistics support," "defensive supporting fire," "intelligence," and "medical support" provided to appropriately vetted Syrian opposition forces).  The Executive Branch has complied with these requirements.

128 Stat. at 3558.  Each quarter, pursuant to the NDAA, Congress receives progress reports with updates on changes to the plan, vetting process, or strategy for assistance, and on a number of other issues, including the amount of funds expended.  *Id.* § 1236(d).

All of these reporting requirements are in addition to the President's six-month consolidated letters consistent with the War Powers Resolution, which provide Congress with updates on Operation Inherent Resolve and military efforts to counter ISIL.  Further, since 2014, Congress has held more than 60 hearings on ISIL, and has heard from such high-ranking officials as the Secretary of Defense, the Secretary of State, and the Chairman of the Joint Chiefs of Staff, among many others, on multiple occasions.[41]

## IV.    The Complaint

Plaintiff is a U.S. Army captain deployed to the Kuwait headquarters of the Combined Joint Task Force for Operation Inherent Resolve.  Compl. ¶ 1.  Plaintiff alleges that he was "ready for action" when President Obama first ordered airstrikes against ISIL targets in Iraq and Syria, and that he continues to "believe[] the operation is justified both "morally" and "militarily."  *Id.* ¶ 5.  Nevertheless, when Plaintiff came to doubt the President's legal authority to continue the operation, he claims that the purported absence of a "serious legal justification for the war" "made it impossible [for him] to determine whether his present mission is inconsistent with his oath" to support

---

[41] *See, e.g.*, *U.S. Policy Towards Iraq and Syria and the Threat Posed by the Islamic State of Iraq and the Levant (ISIL): Hearing Before the S. Comm. on Armed Services*, 113th Cong. 5-72 (Sept. 2014) (statements of Chuck Hagel, Secretary of Defense, and General Martin E. Dempsey, Chairman of the Joint Chiefs of Staff); *The Administration's Strategy and Military Campaign Against Islamic State in Iraq and the Levant: Hearing Before the H. Comm. on Armed Services*, 113th Cong., 4-46 (Nov. 2014) (statements of Chuck Hagel, Secretary of Defense, and General Martin E. Dempsey, Chairman, Joint Chiefs of Staff).

and defend the Constitution, "thus requiring him to seek an independent determination from the Court."  *Id.* ¶ 19.

Plaintiff seeks a declaratory judgment that the President's decision to continue these military operations against ISIL without "specific statutory authorization" from Congress violates the War Powers Resolution, Compl. at 13, which, as relevant here, requires the President to terminate the use of armed forces within 60 days after advising Congress that such forces have been introduced into hostilities, unless Congress has authorized such hostilities, *see* 50 U.S.C. §§ 1543(a), 1544(b).  Plaintiff also seeks a declaratory judgment that the President's alleged failure to provide a "sustained legal justification" for Operation Inherent Resolve violates the President's constitutional responsibility to "take Care that the Laws be faithfully executed."  Compl. ¶ 27.

## ARGUMENT

In reviewing a motion to dismiss for lack of subject-matter jurisdiction, a court is guided by the principle that "[f]ederal courts are courts of limited jurisdiction." *Kokkonen v. Guar. Life Ins. Co.*, 511 U.S. 375, 377 (1994).  A court is presumed to lack jurisdiction in a particular case unless the plaintiff satisfies his burden of establishing that such jurisdiction exists.  *KVOS, Inc. v. Assoc. Press*, 299 U.S. 269, 278 (1936).  Judicial review under Rule 12(b)(1) is not restricted to the pleadings; rather, a court may review extrinsic evidence to address whether it has jurisdiction.  *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005).[42]

---

[42] The Court can also take judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b)(2); *see also Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016).

Federal courts sit to decide cases and controversies, not to resolve disagreements about policy. *See* U.S. Const. art. III, § 2. The "case or controversy" requirement "defines with respect to the Judicial Branch the idea of separation of powers on which the federal government is founded." *Allen v. Wright*, 468 U.S. 737, 750 (1984). Several distinct doctrines elaborate on that core principle and reflect "concern about the proper— and properly limited—role of the courts in a democratic society." *Id*.

To that end, courts consistently have declined to hear challenges to the deployment and use of military forces on justiciability grounds. The breadth and depth of the judicial consensus on this issue is striking, with no fewer than two dozen decisions dismissing challenges to executive military initiatives under various and related justiciability doctrines.[43] Not surprisingly, the most prominent grounds for dismissal of

---

[43] *See, e.g.*, *Ali Jaber v. United States*, --- F. Supp. 3d ----, 2016 WL 706183, at *5 (D.D.C. Feb. 22, 2016) (challenge to U.S. missile strike in Yemen was non-justiciable because "the decision to take military action in Khashamir" is a political question); *El-Shifa Pharm. Indus. v. United States*, 607 F.3d 836, 844 (D.C. Cir. 2010) (en banc) (decision whether to launch a military strike in Sudan was a non-justiciable political question); *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 46-51 (D.D.C. 2010) (dismissing as non-justiciable claim for prospective relief prohibiting the President from using force in counterterrorism operation under 2001 AUMF); *Mahorner v. Bush,* 224 F. Supp. 2d 48, 52-53 (D.D.C. 2002) (dismissing action seeking injunction against military action in the Middle East), *aff'd*, No. 02-5335, 2003 WL 349713 (D.C. Cir. Feb. 12, 2003); *Campbell v. Clinton,* 203 F.3d 19, 24-25 (D.C. Cir. 2000) (Silberman, J., concurring) ("We lack 'judicially discoverable and manageable standards' for addressing [plaintiffs' claims], and the War Powers Clause claim implicates the political question doctrine."); *Industria Panificadora, S.A. v. United States,* 763 F. Supp. 1154, 1159-61 (D.D.C. 1991) (refusing to decide a challenge to the government's deployment of armed forces in Panama), *aff'd on other grounds,* 957 F.2d 886 (D.C. Cir. 1992); *Ange v. Bush,* 752 F. Supp. 509, 513-15 (D.D.C. 1990) (challenge to deployment of troops for Persian Gulf War was non-justiciable political question); *Lowry v. Reagan,* 676 F. Supp. 333, 339-41 (D.D.C. 1987) (dismissing action by members of Congress to declare that events in Persian Gulf were "hostilities" that triggered reporting requirements of War Powers Resolution on political question grounds), *appeal dismissed,* No. 87-5426 (D.C. Cir. Oct. 17, 1988); *Sanchez-Espinoza v. Reagan,* 770 F.2d 202, 210 (D.C. Cir. 1985) (affirming dismissal of challenge to aid Nicaraguan contras); *Crockett v. Reagan,* 558 F. Supp. 893, 898-99

these cases—the political question doctrine and standing—are dispositive here.  Each of these doctrines provides an independent basis for dismissal of this action.

## I.     The Complaint Seeks Resolution of a Non-Justiciable Political Question.

The political question doctrine is "primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and is "designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government," *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990).  It thus "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).  In *Baker*, the Supreme Court identified six characteristics "[p]rominent on the surface of any case held to involve a political question," including:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

---

(D.D.C. 1982) (rejecting challenge to military assistance to El Salvador), *aff'd,* 720 F.2d 1355 (D.C. Cir. 1983) (per curiam); *DaCosta v. Laird,* 471 F.2d 1146, 1154-57 (2d Cir. 1973) (dismissing action challenging air and naval strikes in North Vietnam as non-justiciable political question); *Holtzman v. Schlesinger,* 484 F.2d 1307, 1309-12 (2d Cir. 1973) (finding that the political question doctrine barred review of the United States' bombing of Cambodia); *Mitchell v. Laird,* 488 F.2d 611 (D.C Cir. 1973) (same); *Atlee v. Laird,* 347 F. Supp. 689 (E.D. Pa. 1972) (three-judge court) (same), *aff'd,* 411 U.S. 911 (1973); *Sarnoff v. Connally,* 457 F.2d 809 (9th Cir. 1972) (same).

369 U.S. at 217. The presence of any one of these factors indicates the existence of a political question. *See id.*; *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005). Plaintiff's claims implicate all of the *Baker* factors, in particular the first two.

### a. Decisions Regarding the Use of American Military Forces Are Committed Exclusively to the Political Branches.

"Primary among the conditions [set forth in the *Baker v. Carr* formulation] is the 'textually demonstrable constitutional commitment' of the war powers to both political branches and the 'respect due' the political branches in allowing them to resolve . . . dispute[s] over the war powers by exercising their constitutionally conferred powers." *Ange v. Bush*, 752 F. Supp. 509, 512 (D.D.C. 1990). To the extent there is doubt about the President's authority to conduct a military action, "Congress and the executive will 'decide' whether there has been a usurpation of authority by the latter, through *political* means." *Berk v. Laird*, 429 F.2d 302, 305 (2d Cir. 1970) (emphasis added). Addressing this dynamic, one court has explained that:

> When the executive takes a strong hand, Congress has no lack of corrective power. Congress has the power to tax, to appropriate, to impound, to override a veto. The executive has only the inherent power to propose and to implement, and the formal power to veto. The objective of the drafters of the Constitution was to give each branch "constitutional arms for its own defense."

*Massachusetts v. Laird*, 451 F.2d 26, 34 (1st Cir. 1971). For this and other reasons, "[j]udges traditionally have expressed great reluctance to intercede in disputes between the political branches of government that involve matters of war and peace." *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 97 (D.D.C. 2004); *see also, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952) ("[P]olicies in regard to . . . the war power . . . are so exclusively entrusted to the political branches of government as to be

largely immune from judicial inquiry or interference."); *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973); *Luftig v. McNamara*, 373 F.2d 664, 665 (D.C. Cir. 1967).  Indeed, even where courts have indicated that there *might*, in "extreme" circumstances, be a role for the judiciary in this setting, they have recognized that no such role exists where the political branches are acting together rather than in conflict with respect to a particular military action.  *See, e.g.*, *Berk*, 429 F.2d at 305.

As applicable to the claims here, two general principles can be discerned from these cases.  First, the political question doctrine bars judicial review of suits challenging the President's decision to use military force, at least where, as here, Congress has approved the President's actions, whether through mutual participation or some other means.  *See, e.g.*, *Massachusetts v. Laird*, 451 F.2d at 33 ("the Constitution, in giving some essential powers to Congress and others to the executive, committed the matter to both branches, whose joint concord precludes the judiciary from measuring a specific executive action against any specific [constitutional] clause in isolation"); *see also Crockett v. Reagan*, 720 F.2d 1355 (D.C. Cir. 1983).  Second, beyond a threshold determination that there has been "*some* mutual participation by Congress," *Berk*, 429 F.2d at 305 (emphasis added), the adequacy of the means by which Congress chooses to "give its consent" to executive military action is itself a non-justiciable political question, *Mitchell v. Laird*, 488 F.2d 611, 615 (D.C. Cir. 1973); *see also Orlando*, 443 F.2d at 1042 ("the test is whether there is *any* action by the Congress sufficient to authorize or ratify the military activity in question") (emphasis added).  In other words, once it is determined that the political branches have exercised their respective constitutional roles and responsibilities, and that Congress has ostensibly assented to the military action in

question, there is "no necessity of determining boundaries" between the coordinate branches, and no place for further judicial inquiry. *Massachusetts*, 451 F.2d at 34; *see also Orlando*, 443 F.2d at 1042 (judicial inquiry is limited to determining whether Congress has satisfied its "duty of mutual participation in the prosecution of war").[44]

Decisions following this course abound in the case law. Some courts have found evidence of congressional assent in appropriations for military activities or other affirmative measures that tend to demonstrate Congress's intention to implement and support the military effort in question. *See, e.g.*, *Orlando*, 443 F.2d at 1043 ("legislative action furnishing the manpower and materials of war," including billions of dollars in appropriations, was sufficient participation between the political branches to foreclose further consideration of war powers challenge); *Massachusetts*, 451 F.2d at 34 (political question doctrine barred challenge to military actions "where the executive continues to act not only in the absence of any conflicting Congressional claim of authority but with steady Congressional support").

Other courts, including several in this Circuit, have gone further, inferring consent from the absence of conflict between the political branches. *See, e.g.*, *Crockett v. Reagan*, 558 F. Supp. 893, 898 (D.D.C. 1982), *aff'd*, 720 F.2d 1355 (D.C. Cir. 1983) (political question doctrine precluded judicial inquiry into whether U.S. involvement in El Salvador had triggered the War Powers Resolution where Congress had taken no

---

[44] The War Powers Resolution does not alter this "textually demonstrable constitutional commitment," *Baker*, 369 U.S. at 217. The Resolution "sets forth procedures intended to guarantee Congress, in the absence of a declaration of war, an active role in all decisions concerning the deployment of United States Armed Forces into hostilities abroad." *Lowry v. Reagan*, 676 F. Supp. 333, 335 (D.D.C. 1987). It does not leave it to courts to decide when the use of force is "necessary and appropriate," nor does it provide courts an appropriate role to make that determination.

contrary action); *see also id* at 899 ("If Congress doubts or disagrees with the Executive's

determination that U.S. forces in El Salvador have not been introduced into hostilities or

imminent hostilities, it has the resources to investigate the matter and assert its wishes.");

*DaCosta v. Laird*, 471 F.2d 1146, 1157 (2d Cir. 1973) (where Congress had "taken a

position" by "not cutting off the appropriations that are the wherewithal for [the

President's decision to mine the harbors of North Vietnam]," the political question

doctrine foreclosed judicial inquiry as to whether the President had illegally escalated

military conflict); *United States ex rel. New*, 350 F. Supp. 2d 80 (political question

doctrine foreclosed review as to whether President had authority to initiate military action

in Macedonia because there was "no conflict between the branches on this matter"), *aff'd*

448 F.3d 403 (D.C. Cir. 2006).  *See also Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 211

(D.C. Cir. 1985) (Ginsburg, J., concurring) (where Congress had "expressly allowed the

President to spend federal funds to support paramilitary operations in Nicaragua," a

challenge to the President's military actions under the War Powers Resolution was not

justiciable).[45]   Common to all these cases is a refusal on the part of the judiciary to

_____

[45] Courts have also relied on similar principles to dismiss war power challenges on
ripeness grounds.  *See Doe v. Bush*, 323 F.3d 133, 137-41 (1st Cir. 2003) (challenge to
President's use of military force against Iraq held unripe because it was "impossible to
say yet" whether Congress and the President would be in "actual confrontation");
*Dellums v. Bush*, 752 F. Supp. 1141, 1150 (D.D.C. 1990) (controversies regarding the
allocation of constitutional powers between the President and Congress are not ripe "until
the political branches reach a constitutional impasse").  *Cf. Goldwater v. Carter*, 444 U.S.
996, 997 (1979) (Powell, J., concurring) (cautioning against "decid[ing] issues affecting
the allocation of power between the President and Congress until the political branches
reach a constitutional impasse").   Whatever the rationale, there is a virtual consensus
among the federal courts that a challenge to the President's military actions is not
justiciable where the political branches are not in opposition.

second-guess the judgment of Congress as to how to best exercise its constitutional authority to support a military operation.

Application of these principles should dispose of this case.  In addition to providing *ex ante* authority under the 2001 and 2002 AUMFs, Congress has now ratified the President's military actions against ISIL through joint participation and an unbroken stream of appropriations.  Shortly after announcing the operation, the President asked for and obtained from Congress $5.6 billion, for the express purpose of carrying out specific military activities against ISIL in Iraq and Syria.  *See* 128 Stat. at 2285-95.  Congress has since appropriated an additional $5.0 billion in support of the U.S. counter-ISIL effort, virtually all of it in line with the specific amounts and categories requested by the President.  These funds were made available over the course of two annual budget cycles, in connection with close congressional oversight of the status and scope of U.S. counter-ISIL activities, and with knowledge of the specific measures the President was taking to counter ISIL and the statutory and constitutional provisions under which he claimed the authority to act.  *See, e.g.*, 2016 Appropriations Act Explanatory Statement 289 (highlighting threat posed by the "rise of [ISIL]" and noting that the Act "moves funding from the base appropriation to the [overseas contingency operations] appropriation" for the military "to conduct counter-ISIL operations"); 2016 NDAA § 1224 (expressing Congress's sense that ISIL "poses an acute threat to the people and territorial integrity of Iraq" and that "defeating ISIL is critical to maintaining a unified Iraq").

This steady funding support is by itself sufficient to foreclose any conceivable role for the courts in a challenge to Operation Inherent Resolve.  *See, e.g.*, *Massachusetts v. Laird*, 451 F.2d at 34.  But congressional support for the military campaign against

ISIL extends beyond the basic function of appropriating funds for specific military activities.  Congress also has authorized the Administration to provide various types of lethal and nonlethal assistance to select groups and forces fighting ISIL in Iraq and Syria. In doing so, Congress has defined the parameters of the assistance programs and provided specific direction for the use of its appropriations.  For example, in providing the President with funding and authority to train and lethally equip vetted members of the Syrian opposition and Iraqi security forces, Congress defined the particular groups eligible to receive the assistance and specified that such assistance could be provided only for select, statutorily prescribed purposes—including supporting efforts to combat ISIL in Syria.  2015 NDAA §§ 1209, 1236, 128 Stat. at 3541, 3559.  Congress also directed the Secretary of Defense to provide notice and a report before such assistance is provided.  *Id*. § 1209(b); *see also id*. § 1236(b), (c), 128 Stat. at 3559 ("[N]ot more than 25 percent of such funds may be obligated or expended until not later than 15 days after the Secretary of Defense . . . submits . . . a report . . . that contains a description of" the objectives and operational details of the assistance.).

Throughout this period, Congress has reinforced its oversight role through reporting requirements relating to the costs and status of U.S. counter-ISIL operations, including monthly reports documenting incremental costs of the operation, 2015 Appropriations Act § 8097, 128 Stat. at 2276; 2016 Appropriations Act § 8093, 129 Stat. at 2373; quarterly reports on the status of U.S. forces deployed in support of the operation, 2016 NDAA § 1224, 129 Stat. at 1053; regular reporting from the inspector general for Operation Inherent Resolve, *see supra* notes 38, 39; 5 U.S.C. app. § 8L; and reporting consistent with the requirements in the War Powers Resolution, *see* 2015

Appropriations Act §§ 8140, 9014, 128 Stat. at 2285, 2300; 2016 Appropriations Act §§ 8122, 9019, 129 Stat. at 2380, 2397 (providing that funds could not be used "in contravention of the War Powers Resolution," including the congressional consultation and reporting requirements).  This is in addition to information Congress receives from the Executive Branch during regular oversight hearings.  *See supra* note 41.

At the same time, Congress has not enacted legislation, or even passed a resolution, indicating its opposition to the President's military actions against ISIL. Congress has not terminated either the 2001 or 2002 AUMF, which provide statutory authorization for Operation Inherent Resolve; nor has it denied funds necessary for the operation's prosecution.  Congress has not passed a concurrent resolution purporting to direct removal of U.S. forces pursuant to section 5(c) of the War Powers Resolution, 50 U.S.C. § 1544(c).  *See Ange*, 752 F. Supp. at 512 (observing that the War Powers Resolution "embodies Congress's search for a legal mechanism to enforce the congressional war-making power").[46]  That is telling, considering that Congress "has no lack of corrective power" in the face of what it believes to be unauthorized Executive military action.  *See Massachusetts v. Laird*, 451 F.2d at 34.  Indeed, in the few provisions in which Congress did reference the War Powers Resolution, to clarify that no funds made available for Operation Inherent Resolve are to be used "in contravention" of the Resolution, Congress signaled its agreement that the President's counter-ISIL military actions were authorized by simultaneously funding Operation Inherent Resolve.  *See* 2015 Appropriations Act §§ 8140, 9014, 128 Stat. at 2285, 2300; 2016 Appropriations

---

[46] *But see INS v. Chadha*, 462 U.S. 919, 958 (1983) (holding legislative veto unconstitutional in light of "Constitution's prescription for legislative action: passage by a majority of both Houses and presentment" to the President for signature).

Act §§ 8122, 9019, 129 Stat. at 2380, 2397.  If Congress believed that the United States

had been conducting airstrikes and other counter-ISIL military activities "in

contravention of the War Powers Resolution," it would have made no sense for Congress

to use the "in contravention" proviso in the same laws that make funds available for the

express purpose of *continuing those military activities*.  *See* 2016 Appropriations Act §§

8122, 9019; *cf. Holtzman v. Schlesinger*, 484 F.2d 1307, 1313 (2d Cir. 1973) (proviso in

appropriations bill that no funding could be used for certain military operations after

specified date indicated congressional approval of operations occurring prior to that date).

These various funding, oversight, and authorizing measures reflect steady and

considerable legislative support for Operation Inherent Resolve.  At a minimum, these

measures convey Congress's support for the President's actions, including his

determination that he had and continues to have authority to act under prior congressional

authorizations for the use of military force.  *See, e.g.*, *DaCosta*, 448 F.2d at 1369

("[T]here was sufficient legislative action in extending the Selective Service Act and in

appropriating billions of dollars to carry on military and naval operations in Vietnam to

ratify and approve the measures taken by the Executive").  But an equally strong case can

be made that the appropriations constitute independent authorization of the particular

counter-ISIL military activities they funded, because they "plainly show[] a purpose to

bestow the precise authority" which the President claims to exercise.  *Ex parte Mitsuye

Endo*, 323 U.S. 283, 303 n.24 (1944); *see also Fleming v. Mohawk Wrecking & Lumber

Co.*, 331 U.S. 111, 116 (1947) (recognizing that appropriations statutes may "stand[] as

confirmation and ratification of the action of the Chief Executive"); *Ludecke v. Watkins*,

335 U.S. 160, 173 n.19 (1948) (holding that Congress had "recognized . . . the President's

28

powers under the Alien Enemy Act" to remove enemy aliens summarily during war time "by appropriating funds" for the maintenance, care, detention, surveillance, and transportation of such aliens).[47]

Whether these congressional measures convey approval of the President's interpretation of prior authorizations or independent authorization makes no difference for the purposes of the political question doctrine. The more important consideration is that Operation Inherent Resolve from the start has been the product of a working relationship between the political branches, in which each branch, through "mutual influence and reciprocal action," has asserted and protected its respective constitutional interests. *Orlando*, 443 F.2d at 1043. As one court recognized, "whether viewed as an authorization to bomb or as a limitation on existing authority impliedly granted by other congressional action, [the appropriations measures] constitute a ratification of Cambodian bombing such as to demonstrate that the political branches are in concert." *Drinan v.*

---

[47] This conclusion is not disturbed by section 8(a) of the War Powers Resolution, which purports to bar Congress from authorizing military operations through an appropriations measure unless that measure "states that it is intended to constitute specific statutory authorization within the meaning of this chapter." 50 U.S.C. § 1544(b). As discussed, the Supreme Court has recognized that Congress can authorize executive action through appropriation statutes. *See, e.g.*, *Fleming*, 331 U.S. at 116. To the extent section 8(a) purports to strip Congress of a permissible method of authorizing the use of military force, it contravenes the longstanding principle that one Congress cannot bind a later Congress. *See, e.g.*, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803) (recognizing that legislative acts are "alterable when the legislature shall please to alter [them]"); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135 (1810) (noting that "[t]he correctness of [the] principle" "that one legislature is competent to repeal any [law] which a former legislature was competent to pass, and that one legislature cannot abridge the powers of a succeeding legislature," "can never be controverted"). For this reason, if section 8(a) were construed to foreclose Congress from authorizing executive military activities through an appropriations statute, it would be unconstitutional. Further, whatever the operative effect of section 8(a), that provision does not speak to whether Congress agrees with the President's conclusion that military operations against ISIL are authorized by the 2001 and 2002 AUMFs, and it certainly has no bearing on whether Congress's actions should preclude judicial review under the political question doctrine.

*Nixon*, 364 F. Supp. 854, 862 (D. Mass. 1973).  Under these circumstances, the political question doctrine forecloses judicial review, and this case must be dismissed.

### b.  The Court Lacks Expertise and Judicially Manageable Standards for Resolving Plaintiff's Claims.

Quite apart from the fact that this case presents "a matter so entirely committed to the care of the political branches as to preclude" judicial consideration, the political question doctrine forecloses judicial review because the very determination whether ISIL is an authorized military target is itself a political question.  Plaintiff asks the Court to review the President's determination that he has statutory authority to take military action against ISIL.  He frames the question in purely legal terms, as if the Court could resolve it based on a garden-variety statutory analysis of the 2001 and 2002 AUMFs.  *See* Compl. ¶¶ 21-23.  On the contrary, resolving this claim would require not only that the Court second-guess the President's continuing judgment that he has authority to take military action against a terrorist organization in the midst of a live conflict, but also that the Court do so without the relevant expertise or access to the type of information necessary to render an informed judgment, and without any standards to govern its analysis.

Several courts have concluded that the political question doctrine precludes review of a claim that a particular military operation was taken in excess of statutory authority.  *See, e.g.*, *DaCosta*, 471 F.2d at 1155 (declining to consider whether mining harbors in Vietnam was an "escalation" of war beyond congressional authorization); *Holtzman*, 484 F.2d at 1310 (declining to consider claim that bombing of Cambodia was a "basic change" in the scope of the war).  Similarly, the D.C. Circuit has concluded that the political question doctrine bars judicial review of the merits of an executive decision to launch an attack on a foreign terrorism target.  *El-Shifa Pharm. Indus. Co. v. United*

*States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (en banc); *see also Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 45 (D.D.C. 2010) (dismissing as non-justiciable claim for prospective relief prohibiting the President from using force in counterterrorism operation under 2001 AUMF). Common to all these cases is the recognition that federal judges "lack[] vital information upon which to assess the nature of battlefield decisions, and sitting thousands of miles from the field of action," *DaCosta*, 471 F.2d at 1155, and thus are not equipped to review the myriad political and strategic decisions regarding the use of military power in response to external threats, *El-Shifa*, 607 F.3d at 842.

These concerns are present in this case as well. The 2001 and 2002 AUMFs delegate authority to the President to determine whether authority exists to target a particular individual or organization, and a challenge to such a determination cannot be adjudicated without implicating the sensitive factual and policy judgments upon which it rests. *See, e.g.*, *DaCosta*, 471 F.2d at 1155. Here, at a minimum, the Court would have to understand and assess the nature and extent of ISIL's relationship with "those nations, organizations, or persons" that "planned, authorized, committed, or aided" the September 11 attacks, or that "harbored such organizations or persons," 2001 AUMF, § 2, 115 Stat. at 224; as well as the threat ISIL poses to U.S. national security interests in Iraq, 2002 AUMF, § 3, 116 Stat. at 1501. Even this limited fact-finding would thrust the Court into the realm of "delicate, complex" policy judgments beyond the competence of the judiciary, *Chicago & S. Air Lines v. Waterman Corp.*, 333 U.S. 103, 111 (1948), in part because the question turns on military, intelligence, and foreign policy considerations that are appropriately left to the political branches, particularly where the core judgment at issue is whether to deploy U.S. forces against an adversary overseas.

31

The Court's difficulties would not end there.  In addition to deciding whether ISIL is an authorized military target, the statutory analysis calls for consideration of the President's continuing judgment that recent military operations are "necessary and appropriate" to "prevent any future acts of international terrorism," 2001 AUMF, § 2, 115 Stat. at 224, and to "defend the national security of the United States against the continuing threat posed by Iraq," 2002 AUMF, § 3, 116 Stat. at 1501.  It bears repeating that these are quintessentially policy determinations for the executive—judgments made in the context of a fluid and evolving military conflict, and resting upon a broad range of sensitive information and analysis, including numerous and sometimes conflicting reports from military and diplomatic advisers, intelligence sources, and foreign partners.  *See El-Shifa*, 607 F.3d at 841; *Al-Aulaqi*, 727 F. Supp. 2d at 45.  These elements make up the very essence of an "initial policy determination of a kind clearly for nonjudicial discretion."  *Baker*, 369 U.S. at 217.

Further, even if the Court could "know[] all there is to know" about Operation Inherent Resolve and the conflict with ISIL, it still would "not know what standards to apply to those facts."  *Campbell*, 203 F.3d at 26.  The D.C. Circuit has recognized that courts cannot consider questions of this nature "without first fashioning out of whole cloth" some standard "by which the United States government evaluates intelligence in making a decision to commit military force" in support of its counterterrorism efforts. *El-Shifa*, 607 F.3d at 845; *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1367 n.6 (Fed. Cir. 2004) (holding that a takings claim raised a non-justiciable political question).  Notably, in another challenge in this district to the President's authority to conduct counterterrorism actions under the 2001 AUMF, the court recognized that "there

are no judicially manageable standards by which courts can endeavor to assess the President's interpretation of military intelligence and his resulting decision—based on that intelligence—whether to use military force against a terrorist target overseas." *Al-Aulaqi*, 727 F. Supp. 2d at 47.   Evaluating the President's interpretation of military, intelligence, and foreign policy considerations in connection with decisions about the use of force overseas against a terrorist adversary is precisely what Plaintiff is asking the Court to do in this case.  That inquiry is barred by the political question doctrine, and the mere fact that it would form part of a broader statutory analysis does not make it justiciable. *El-Shifa*, 607 F.3d at 843.[48]

Finally, setting aside the question of judicial competence, consideration of Plaintiff's claims would necessarily place the judiciary in the position of overseeing the President's decisions in the midst of an ongoing military operation, and call into question whether the United States is presenting a "single-voiced statement" as to whether it has authority to use military force against ISIL. *See Baker*, 369 U.S. at 211.  Through their

---

[48] Although courts previously have considered and decided the U.S. Government's authority to detain individuals under the 2001 AUMF in the context of habeas litigation brought by Guantanamo detainees, the Guantanamo habeas cases are distinguishable on a number of grounds.  First, habeas petitions are "more amenable to judicial resolution" than the claims presented here, because "the Constitution specifically contemplates a judicial role" for individuals challenging their detentions. *El-Shifa*, 607 F.3d at 848; *cf. United States v. Caceres*, 440 U.S. 741 (1979) (distinguishing between those rules designed to protect the rights of citizens and those designed to affect the management of governmental functions).  Second, Plaintiff's claims raise the much broader question whether the President has authority to carry out military actions against a terrorist organization overseas, including into the future.  The habeas cases, in contrast, are focused on whether "the United States has unjustly deprived an American citizen of liberty through acts it has already taken," *Al-Aulaqi*, 727 F. Supp. 2d at 50 (quoting *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 65 (D.D.C. 2004), based on a legal standard developed by the Executive Branch for detention.  "These post hoc determinations are precisely what courts are accustomed to assessing." *Al-Aulaqi*, 727 F. Supp. 2d at 49-50 (internal quotation marks omitted).

mutual support for Operation Inherent Resolve, the political branches are engaged in a delicate military and foreign policy calculus—one that could be severely disrupted by judicial intervention.   A judicial declaration that contradicts executive and legislative judgments on the issue "might create doubts in the international community regarding the resolve of the United States to adhere to this position."   *Lowry*, 676 F. Supp. at 340; *see Smith v. Reagan*, 844 F.2d 195, 199 (4th Cir. 1988) (citing risk that pronouncements by federal courts regarding executive action under the Hostage Act might jeopardize diplomatic negotiations).   At the very least, it would give rise to multifarious pronouncements to officials in the field with respect to the real-time use of force against ISIL, thereby "expressing [a] lack of the respect due coordinate branches of government," and underscoring the "need for unquestioning adherence to a political decision already made."   *See Baker*, 369 U.S. at 217.   For all these reasons, Plaintiff's challenge to whether the President has authority to act against ISIL presents a clear political question.

## II.     Plaintiff Lacks Standing.

The Court may also dismiss this case for lack of standing.   A party seeking to invoke a federal court's jurisdiction bears the burden of establishing his standing to sue. To meet that burden, Plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."   *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

Unlike previous service members who have sued to challenge active military operations, Plaintiff does not base his standing on the harms generally associated with deployment to a theater of combat.   He does not claim that Operation Inherent Resolve has jeopardized his life or livelihood, *see, e.g.*, *Berk*, 429 F. 2d at 302, and he raises no

moral or philosophical objections to participating in the military effort, *see, e.g.*, *Ashton v. United States*, 404 F.2d 95 (8th Cir. 1968); *Massachusetts v. Laird*, 451 F.2d at 26.  On the contrary, Plaintiff alleges that Operation Inherent Resolve is a "good war" that is "justified both militarily and morally"—the type of operation he "signed up to be part of" when [he] joined the military."  Compl. Ex. A ¶ 5.  Rather, Plaintiff's theory of standing is that supporting a military operation he perceives to be illegal requires him to violate the oath he took to support and defend the Constitution.  As explained below, there is no legal support for Plaintiff's theory of oath-taker standing, and even if there were, Plaintiff cannot plausibly show that the President's actions have forced him to violate his oath.

### a.   Plaintiff Has Not Asserted a Cognizable Injury in Fact.

Plaintiff's claim that he is being forced to betray his oath is insufficient to establish standing because the violation of an oath, by itself, is not an injury in fact.  To establish injury in fact, a plaintiff must show that he or she has suffered "an invasion of a legally protected interest" that is "concrete and particularized."  *Spokeo*, 136 S. Ct. at 1548.  A plaintiff cannot make that showing by "raising only a generally available grievance about government—claiming only harm to his interest in proper application of the Constitution and laws."  *Lance v. Coffman,* 549 U.S. 437, 439 (2007) (per curiam) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573-74 (1992)).  This is no less true for federal officials who assert that executive or congressional action inhibited the performance of their duties.  *See Raines v. Byrd*, 521 U.S. 811, 821 (1997) (members of Congress lacked standing to challenge Line Item Veto Act based on allegations that it would deprive them of their constitutional role where the plaintiffs "have not been singled out for specially unfavorable treatment as opposed to other Members of their

respective bodies" and "do not claim that they have been deprived of something to which they *personally* are entitled").

In line with *Raines*, lower courts repeatedly have rejected the suggestion that swearing an oath to defend the Constitution can transform a federal officer's abstract, generalized injury into the "personal, particularized, [and] concrete" injury required for Article III standing.  In *Drake v. Obama*, for example, the Ninth Circuit held that an active-duty military officer seeking to challenge President Obama's qualifications as Commander in Chief could not base standing on his assertion that obeying the orders of a purportedly ineligible President would violate his oath to defend the Constitution.  664 F.3d 774, 780 (9th Cir. 2011).  The plaintiff's injuries, the court explained, were "not sufficiently concrete to establish Article III standing, regardless of his military oath."  *Id.* The Fifth Circuit adopted similar reasoning in *Crane v. Johnson*, holding that an Immigration and Customs Enforcement agent lacked standing to challenge a Department of Homeland Security directive based on the "subjective belief that complying with the Directive will require him to violate his oath."  783 F.3d 244, 253 (5th Cir. 2015).  And in *Rodearmel v. Clinton*, a three-judge panel of this court held that "oath-based" standing was insufficient to support a foreign service officer's challenge to the appointment of the Secretary of State.  666 F. Supp. 2d 123, 131 (D.D.C. 2009).[49]

---

[49] Other decisions follow the same course.  *See, e.g.*, *Thomas v. Mundell*, 572 F.3d 756, 761 (9th Cir. 2009) (county attorney's "personal dilemma in performing official duties that he perceives to be unconstitutional" was not sufficient to generate standing); *City of S. Lake Tahoe v. Cal.Tahoe Reg'l Planning Agency*, 625 F.2d 231, 237 (9th Cir. 1980) (councilmembers who claimed enforcing land use regulation would be inconsistent with their oaths had alleged nothing more than "abstract outrage at the enactment of an unconstitutional law"); *New Jersey Peace Action v. Obama*, 2009 WL 1416041 (D.N.J. 2009) (service member lacked standing to challenge Iraq war based on rationale that he was injured by being compelled to obey orders he perceived as illegal).

Applying the foregoing principles, Plaintiff lacks standing because the injury he asserts is neither "concrete" nor "particularized."  *See Spokeo*, 136 S. Ct. at 1548.  With respect to concreteness, there is no material difference between the injury alleged by Plaintiff and those alleged by the plaintiffs in *Drake*, *Crane*, *Rodearmel*, and other oath-based standing decisions.   As in those cases, the source of Plaintiff's complaint is an abstract disagreement with the President over the legality of a policy decision.  Plaintiff identifies "[n]o consequences, save those of conscience self-imposed by [Plaintiff's] personal beliefs," *City of S. Lake Tahoe*, 625 F.2d at 237, that flow from the supposed violation of the oath.  Plaintiff does not allege that a specific duty or responsibility he has as an intelligence officer has been impaired, or that a commanding officer has given him an order or taken any action that has changed the terms of his employment or aggrieved him in any personal or tangible way.  At most, Plaintiff has alleged a "personal dilemma" in performing official duties he perceives to be unlawful, based on his disagreement about whether Operation Inherent Resolve is properly authorized by law.  *Thomas*, 572 F.3d at 761.  But without identifying any "personal injury suffered . . . *as a consequence* of the illegal constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees," Plaintiff cannot demonstrate a concrete injury in fact.  *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982).[50]

---

[50] It is a testament to the abstract nature of Plaintiff's interest in this litigation that the outcome of a ruling would actually have no bearing on his asserted injury.  "[T]he basic concern of the standing doctrine is that the individual complaining party have such a strong connection to the controversy that its outcome will demonstrably cause him to win or lose in some measure."  *Harrington v. Bush*, 553 F.2d 190, 206 (D.C. Cir. 1977).  Plaintiff asserts that the President's failure to publish "a serious legal justification" for Operation Inherent Resolve "made it impossible for Captain Smith to determine whether

For similar reasons, Plaintiff has not alleged an injury that is "particularized." Like the injury alleged in *Raines*, the harm asserted here is a quintessential "institutional injury," based on Plaintiff's official status as a military officer, that damages all similarly situated service members equally. 521 U.S. at 821. Plaintiff does not claim that he has been "singled out for specially unfavorable treatment," or that he has been "deprived of something to which [he] *personally* is entitled." *Raines*, 521 U.S. at 821. Instead, he attempts to litigate a general grievance about the operation of the government, a grievance shared in more or less equal measure with "a subclass of citizens who suffer no distinctive concrete harm," *Lujan*, 504 U.S. at 576-577; *see also Harrington*, 553 F.2d at 206; *Kucinich v. Obama*, 821 F. Supp. 2d 110, 115 (D.D.C. 2011) (applying *Raines* in context of a challenge to military action). The particularity requirement is meant to limit the number of potential plaintiffs and defendants for any given claim to those with a distinct interest in the subject matter at issue. *Allen*, 468 U.S. at 752. Plaintiff's expansive theory of standing would have the opposite effect, "confer[ring] standing on any public official who believes that a statute which he or she is charged with enforcing is unconstitutional." *City of S. Lake Tahoe*, 625 F.2d at 237. Such an extraordinary outcome would "convert all officials charged with executing statutes into potential litigants, or attorneys general, as to laws within their charge." *Id*. at 238.[51]

---

his present mission is inconsistent with his oath," "thus requiring him to seek an independent determination from the Court." Compl. ¶ 19. In other words, Plaintiff does not know whether his present mission is consistent with his oath, and his "real interest is in having the question of the legality of [Operation Inherent Resolve] decided one way or the other." *See Harrington*, 553 F.2d at 206.

[51] To the extent Plaintiff's legal injury instead is premised on the possibility that he will be sued in the future for his actions supporting Operation Inherent Resolve, that injury is insufficient to confer standing. The "threatened injury must be *certainly impending* to constitute injury in fact," and "allegations of *possible* future injury are not

### b. The Performance of Plaintiff's Official Duties Is Not Inconsistent with His Oath and Thus Does Not Constitute a Personal Injury.

Even if the violation of an oath were a cognizable injury in fact, Plaintiff has not plausibly alleged and cannot show that mere participation in a military operation he perceives to be unlawful conflicts with his oath to support and defend the Constitution. *See Spokeo*, 136 S. Ct. at 1547 (stating that "at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element" of the standing test).

Plaintiff does not allege that he is being ordered to engage in any unlawful conduct, and the performance of his duties as an intelligence officer does not violate his oath to support and defend the Constitution simply because he may believe the underlying "war" has not been properly authorized by Congress.  An oath to "support" and "defend" the Constitution does not "impose obligations of specific, positive action on oath takers," but simply assures that they are "willing to commit themselves to live by the constitutional processes of our system."  *Cole v. Richardson*, 405 U.S. 676, 684 (1972). Under that system, military personnel "are duty-bound to implement whatever *policy* decisions the civilian leadership may make."  *United States v. New*, 55 M.J. 950 (C.A.A.F. 2001) (Effron, J., concurring) (emphasis added).  Further, "subordinates are not required to screen the orders of superiors for questionable points of legality, and may, absent specific knowledge to the contrary, presume that orders have been lawfully issued."  Department of Defense, Law of War Manual § 18.3.2.1, at 1058 (June 2015).

---

sufficient."  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (internal quotation marks omitted).  The remote possibility that Plaintiff may, one day, be found liable for damages as a result of his mere participation in a military operation is a far cry from the imminence required by Article III.  *See City of S. Lake Tahoe*, 625 F.2d at 238 (no standing to challenge ordinance on the basis that enforcement may subject public officials to future civil liability).

To be sure, a service member may face the dilemma of violating his oath if confronted with an order to carry out a patently illegal act during war.  But the same dilemma does not arise from a mere disagreement as to whether Congress has lawfully authorized a military operation.  *Cf. United States v. Berrigan*, 283 F. Supp. 336, 341 (D. Md. 1968) ("As the Nuremberg verdicts show, merely to fight in an aggressive war is no crime. What is a crime is personally to fight by foul means."). *United States v. Huet-Vaughn*, 43 M.J. 105, 114 (C.A.A.F. 1995) ("The duty to disobey an unlawful order applies only to 'a positive act that constitutes a crime' that is 'so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness.'"); *see also* Captain Robert E. Murdough, *"I Won't Participate in an Illegal War": Military Objectors, the Nuremberg Defense, and the Obligation to Refuse Illegal Orders*, Army Law., July 2010, at 12 ("We draw a line between the war itself, for which soldiers are not responsible, and the conduct of the war, for which they are responsible, at least within their own sphere of activity."); *see also id*. at 13 ("[t]he legality of war is not the professional responsibility of soldiers.").[52]

As these principles demonstrate, Plaintiff has not made a plausible case that his participation in Operation Inherent Resolve has forced him to violate his oath.  Indeed, to find a cognizable injury based on a service member's oath in this setting would turn the military's system of order and obedience on its head.  *United States v. New*, 55 M.J. 95,

---

[52] As the DOD Law of War Manual further explains, there is a recognized distinction between law concerning the resort to force (*jus ad bellum*) and law concerning conduct in war (*jus in bello*).  Although individual military members can be held responsible for each's violations of *jus in bello* rules, they generally have no influence on the threshold decision of a state to use force.  LOW Manual § 3.5.2.3, at 88; *see id*. § 3.5.3 ("[T]he *jus ad bellum* principle of *competent authority* (also called *right authority*) acknowledges that the resort to military force is a prerogative of the State.").

108 (C.A.A.F. 2001) ("[A]llowing private judgments by a soldier as to which orders to obey would be 'unthinkable and unworkable,' and would mean that the 'military need for his services must be compromised.'").  Although Plaintiff may sincerely believe that his participation in Operation Inherent Resolve is at odds with his oath, that belief does not allow him to establish Article III standing to challenge a policy decision to undertake a military operation by the President.

## III.    Plaintiff's Claims Are Also Barred by Sovereign Immunity.

The Court lacks subject-matter jurisdiction for the additional reason that Plaintiff has identified no waiver of sovereign immunity that permits his claims to go forward.  It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  *United States v. Mitchell*, 463 U.S. 206, 212 & n.9 (1983).  "A party bringing suit against the United States bears the burden of proving that the government has unequivocally waived its immunity."  *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575 (D.C. Cir. 2003).  Although the complaint includes five separate counts, the only claims for which Plaintiff seeks affirmative relief are Count I (War Powers Resolution) and Count II (Take Care Clause).  *See* Compl. at 13.[53]  Plaintiff has not identified any waiver of sovereign immunity that would permit him to bring these claims against the President.

Although Plaintiff asks for relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, that statute does not waive sovereign immunity.  *Buaiz v. United States*, 471 F. Supp. 2d 129, 138 (D.D.C. 2007).  Further, Section 702 of the Administrative

---

[53] The remaining counts—III (2001 AUMF), IV (2002 AUMF), V (Commander-in-Chief)—are listed under the rubric of "actions taken in excess of President's authority" and not referenced in the prayer for relief.

Procedure Act (APA) waives sovereign immunity only to claims challenging the actions of federal agencies and their officers and employees.  5 U.S.C. § 702.  That waiver is not available in suits against the President, because the President is not an "agency" within the meaning of the APA, nor an officer or employee of an agency.  *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992) (plurality op.); *Swan v. Clinton*, 100 F.3d 973, 981 n.4 (D.C. Cir. 1996).  Plaintiff therefore may not assert claims against the President through reliance on the waiver of sovereign immunity in the APA.

Finally, Plaintiff cannot escape limitations of sovereign immunity by resort to *Larson v. Domestic & Foreign Commerce Corp.*, which recognizes an exception to sovereign immunity in cases where a federal officer is alleged to act in excess of statutory or constitutional bounds, such that the officer "is not doing the business which the sovereign has empowered him to do."  337 U.S. 682, 689 (1949).  It would be far-fetched to suggest that the President was not "doing the business" of the sovereign when he ordered U.S. armed forces to carry out military actions against a foreign terrorist organization.  Plaintiff is not challenging the "power of the [President], under the [relevant statues], to make a decision at all," but rather "the correctness or incorrectness" of the decisions made.  *Id.* at 691 n.12; *see also id.* at 689-690 (distinguishing between claims that an officer acted "*ultra vires* his authority," which are the proper subject of specific relief, and mere "claim[s] of error in the exercise of that power," which are barred by sovereign immunity).[54]

---

[54] The conclusion that the United States has not consented to be sued under the War Powers Resolution is reinforced by the absence of a cause of action for private parties to enforce the statute's terms.  The Resolution governs when and under what circumstances the President can introduce U.S. armed forces into hostilities overseas.  It does not create a private cause of action to enforce its terms.  *See Sanchez-Espinoza*, 770 F.2d at 209 (the

For this reason as well, any statutory claim or constitutional claim under the Take Care Clause must be dismissed on sovereign immunity grounds.  Plaintiff erroneously claims that the Take Care Clause imposes a duty on the President to publish, within the 60-day period specified by the War Powers Resolution, a "sustained legal justification" for his military operations so that Plaintiff can "determine whether his military actions as an officer are consistent with his oath to [support and defend] the Constitution."  Compl. ¶ 28.  No such duty exists in the War Powers Resolution, and Plaintiff's attempt to import one from the Take Care Clause is a transparent effort to disguise a meritless statutory argument in constitutional clothes.

Finally, even if it could be construed as an independent constitutional claim, the Take Care Clause offers no basis for relief because the Court could not undertake this inquiry without expressing a "lack of the respect due" to the President, *Baker*, 369 U.S. at 217, by assuming judicial review over the exercise of Executive power that the Take Care Clause commits to the President.  The Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction.  *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867).

---

Resolution does not "identify any 'special class to be benefited,'… but rather, 'for the protection of the general public,' divide[s] responsibility between the executive and legislative branches of government … in order to secure sound and efficient conduct of military and foreign affairs."); *id.* ("Neither the text nor the legislative history of [the WPR] suggests an attempt to create private damage actions, which would be strange tools for resolution of inter-branch disputes or allocation of intra-branch responsibilities, particularly in the sensitive fields of military and foreign affairs.").

**IV.     Plaintiff Cannot Obtain Equitable Relief Against the President.**

For similar reasons, the relief sought in the complaint is not available against the President.  Even outside the war context, the Supreme Court has made clear that an injunctive action against the President could lie, if at all, only in very limited circumstances, and that any such injunction would be extraordinary.  *Franklin*, 505 U.S. at 802-03 (relying on *Johnson*, 4 Wall. at 498-99 for the proposition that "in general" the courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties"); *see also Franklin*, 505 U.S. at 826 (Scalia, J. concurring) ("no court has authority to direct the President to take an official act"); *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982) ("[t]he President's unique status under the Constitution distinguishes him from other executive officials").  These same concerns apply to actions for declaratory relief.  *See Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) (noting that "[a] court—whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions") (citation omitted); *Swan*, 100 F.3d at 977 n.1 ("[S]imilar considerations regarding a court's power to issue relief against the President himself apply to [a] request for a declaratory judgment.").

Thus, the declaratory relief Plaintiff seeks directly against the President is not available.  At a minimum, the foregoing considerations support the exercise of equitable discretion in declining to enter the relief Plaintiff seeks.  *See Sanchez-Espinoza*, 770 F.2d at 207-08 (recognizing that "all the bases for nonmonetary relief—including injunction, mandamus, and declaratory judgment—are discretionary").  If ever an action for equitable relief might lie against the President, it should not lie in this case, which concerns the lawfulness of the President's use of military force outside the United States.

*See id.*[55]   The Supreme Court has recognized that discretion is particularly warranted where equitable relief would entail "judicial intrusion into the Executive's ability to conduct military operations abroad."  *Munaf v. Geren*, 553 U.S. 674, 700 (2008); *Mitchell*, 488 F.2d at 616 (D.C. Cir. 1973) ("[A] court would not substitute its judgment for that of the President, who has an unusually wide measure of discretion in this area, and who should not be judicially condemned except in a case of clear abuse amounting to bad faith.").[56]

Accordingly, even apart from the political question, standing, and sovereign immunity grounds for dismissal outlined above, Plaintiff's demand for equitable relief against the President should be rejected as a matter of law.

## CONCLUSION

For the foregoing reasons, Plaintiff's claims should be dismissed for lack of jurisdiction.

---

[55] *Cf. Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) (recognizing that courts generally have discretion whether to exercise jurisdiction over a Declaratory Judgment Act claim).

[56] Further, no court has ever granted an individual service member such relief against his Commander in Chief, and any attempt to do so would raise significant separation-of-powers concerns by injecting the court directly into the chain of command that is so critical to the proper functioning of the armed forces.  *Chappell v. Wallace*, 462 U.S. 296, 300 (1983) ("Civilian courts must, at the very least, hesitate long before entertaining a suit which asks the court to tamper with the established relationship between enlisted military personnel and their superior officers; that relationship is at the heart of the necessarily unique structure of the military establishment."); *see also United States v. Stanley*, 483 U.S. 669, 682-83 (1987).

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Branch Director
Civil Division

 /s/ Samuel M. Singer
SAMUEL M SINGER (D.C. Bar 1014022)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, D.C.  20530
Telephone:  (202) 616-8014
Fax:  (202) 616-8470