# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATHAN MICHAEL SMITH,<br>    Plaintiff<br>    v.<br>BARACK H. OBAMA,<br>    Defendant | Civil Action No. 16-843 (CKK) |

## MEMORANDUM OPINION
(November 21, 2016)

Plaintiff is a U.S. Army Captain who was deployed, until recently, to the Kuwait headquarters of the Combined Joint Task Force-Operation Inherent Resolve. Operation Inherent Resolve is the designation the U.S. Department of Defense has given to the military campaign against the Islamic State of Iraq and the Levant ("ISIL")[1] initiated by the United States and its allies in 2014. Plaintiff considers the operation to be a "good war" and "what [he] signed up to be part of when [he] joined the military." Nonetheless, Plaintiff seeks a declaration that Operation Inherent Resolve is illegal because Congress has not authorized it. Specifically, Plaintiff alleges that President Barack H. Obama has not sought Congress' authorization for military action against ISIL in accordance with the War Powers Resolution, and that neither the President's Commander-in-Chief power, nor prior Congressional authorizations for the use of force, give the President the authority to continue these actions. Plaintiff acknowledges that whether military action has been duly authorized is generally a question "Congress is supposed to answer," but complains that Congress is "AWOL." Plaintiff also claims that the Take Care Clause requires President Obama to publish a "sustained legal justification" for Operation Inherent Resolve to

---

[1] Plaintiff refers to this group as the Islamic State of Iraq and Syria ("ISIS"). Except where quoting Plaintiff, the Court will refer to the group as ISIL.

enable Plaintiff to determine for himself whether this military action is consistent with his oath to preserve and protect the Constitution.

Before the Court is Defendant's [9] Motion to Dismiss.  Defendant argues that this Court lacks jurisdiction over Plaintiff's claims for a number of reasons.  Specifically, Defendant argues that (1) Plaintiff's claims raise non-justiciable political questions, (2) Plaintiff lacks standing, (3) there has been no waiver of sovereign immunity, and (4) Plaintiff cannot obtain equitable relief against the President.

Upon consideration of the pleadings,[2] the relevant legal authorities, and the record as a whole, the Court GRANTS Defendant's [9] Motion to Dismiss.  First, the Court determines that Plaintiff does not have standing because the specific legal injury about which he complains is not sufficiently concrete or particularized.  Second, the Court finds that Plaintiff's claims raise non-justiciable political questions.

## I. BACKGROUND

### A. Operation Inherent Resolve

On September 10, 2014, President Obama announced to the American people that America would "lead a broad coalition to roll back" the "terrorist threat" posed by ISIL.[3]  The President announced that the United States would "degrade and ultimately destroy ISIL through

---

[2] The Court's consideration has focused on the following documents:
- Def.'s Mot. to Dismiss ("Def.'s Mot."), ECF No. 9;
- Pl.'s Mem. in Opp'n to Mot. to Dismiss ("Pl.'s Opp'n"), ECF No. 10;
- Brief of Amici Curiae in Opp'n to Mot. to Dismiss ("Amici Brief"), ECF No. 12; and
- Def.'s Reply Mem. in Support of Mot. to Dismiss ("Def.'s Reply"), ECF No. 14.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

[3] President Barack H. Obama, *Statement by the President on ISIL* (Sept. 10, 2014), https://www.gpo.gov/fdsys/pkg/DCPD-201400654/pdf/DCPD-201400654.pdf.

a comprehensive and sustained counterterrorism strategy," which included "a systematic campaign of airstrikes," increased "support to forces fighting these terrorists on the ground," counterterrorism strategies, and humanitarian assistance. *Id.* The President stated that he had "secured bipartisan support for this approach here at home," and that although he had "the authority to address the threat from ISIL," he "welcome[d] congressional support for this effort in order to show the world that Americans are united in confronting this danger." *Id.* The Department of Defense later designated this effort "Operation Inherent Resolve."[4]

Following his address, on September 23, 2014, the President sent a letter to Congress reiterating that he had "ordered implementation of a new comprehensive and sustained counterterrorism strategy to degrade, and ultimately defeat, ISIL."[5] In this letter, President Obama explained the military actions he had ordered, and stated that:

> I have directed these actions, which are in the national security and foreign policy interests of the United States, pursuant to my constitutional and statutory authority as Commander in Chief (including the authority to carry out Public Law 107–40 and Public Law 107–243) and as Chief Executive, as well as my constitutional and statutory authority to conduct the foreign relations of the United States.
>
> I am providing this report as part of my efforts to keep the Congress fully informed, consistent with the War Powers Resolution (Public Law 93–148). I appreciate the support of the Congress in this action.

*Id.* Public Law 107-40 and Public Law 107-243, referenced by the President, were passed by Congress in 2001 and 2002, and each constitute specific authorization for the use of military force. First, in response to the terrorist attacks of September 11, 2001, Congress passed a Joint

---

[4] U.S. Dep't of Def., *Centcom Designates Ops Against ISIL as "Inherent Resolve"* (Oct. 15, 2014), http://www.defense.gov/News-Article-View/Article/603462.
[5] President Barack H. Obama, *Letter to Congressional Leaders Reporting on the Deployment of United States Armed Forces Personnel To Iraq and the Authorization of Military Operations in Syria* (Sept. 23, 2014), https://www.gpo.gov/fdsys/pkg/DCPD-201400697/pdf/DCPD-201400697.pdf.

Resolution to "authorize the use of United States Armed Forces against those responsible for the recent attacks launched against the United States."  Authorization for Use of Military Force, Pub. L. No. 107–40, 115 Stat. 224 (2001) ("2001 AUMF").  The 2001 AUMF states that "the President is authorized to use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons."  Pub. L. No. 107–40, § 2(a).  It also states that "[c]onsistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution."  Pub. L. No. 107–40, § 2(b)(1).

Second, in 2002 Congress passed a Joint Resolution authorizing the President "to use the Armed Forces of the United States as he determines to be necessary and appropriate in order to . . . defend the national security of the United States against the continuing threat posed by Iraq."  Authorization for Use of Military Force against Iraq Resolution of 2002, Pub. L. No. 107-243, § 3(a)(1), 116 Stat. 1498 (2002) ("2002 AUMF").  The 2002 AUMF also states that "[c]onsistent with section 8(a)(1) of the War Powers Resolution, the Congress declares that this section is intended to constitute specific statutory authorization within the meaning of section 5(b) of the War Powers Resolution."  Pub. L. No. 107-243, § 3(c)(1).

The President's determination that ISIL was an authorized target pursuant to the 2001 and 2002 AUMFs was expanded on in a speech given by Stephen W. Preston, the General Counsel of the Department of Defense, at an annual meeting of the American Society of

International Law on April 10, 2015.[6]  Preston explained that ISIL was an appropriate target

under the 2001 AUMF because the group had long fought the United States alongside al Qaeda,

which was responsible for the September 11th attacks.  Preston stated that ISIL had previously

been known as al Qaeda in Iraq after its leader, Abu Musab al-Zarqawi, had pledged his

allegiance to Osama bin Laden in 2004.  *Id.*  He stated that "[f]or years afterwards, al-Zarqawi's

group, often referred to as al-Qa'ida in Iraq, or AQI for short, conducted numerous deadly

terrorist attacks against U.S. and coalition forces, as well as Iraqi civilians, using suicide

bombers, car bombs and executions.  In response to these attacks, U.S. forces engaged in combat

– at times, near daily combat – with the group from 2004 until U.S. and coalition forces left Iraq

in 2011."  *Id.*  Based on this history, Preston explained that "[t]he 2001 AUMF has authorized

the use of force against the group now called ISIL since at least 2004, when bin Laden and al-

Zarqawi brought their groups together."  *Id.*  He went on to explain that:

> The recent split between ISIL and current al-Qa'ida leadership does
> not remove ISIL from coverage under the 2001 AUMF, because
> ISIL continues to wage the conflict against the United States that it
> entered into when, in 2004, it joined bin Laden's al-Qa'ida
> organization in its conflict against the United States. As AQI, ISIL
> had a direct relationship with bin Laden himself and waged that
> conflict in allegiance to him while he was alive. ISIL now claims
> that it, not al-Qa'ida's current leadership, is the true executor of bin
> Laden's legacy. There are rifts between ISIL and parts of the
> network bin Laden assembled, but some members and factions of
> al-Qa'ida-aligned groups have publicly declared allegiance to ISIL.
> At the same time, ISIL continues to denounce the United States as
> its enemy and to target U.S. citizens and interests.
>
> In these circumstances, the President is not divested of the
> previously available authority under the 2001 AUMF to continue
> protecting the country from ISIL – a group that has been subject to
> that AUMF for close to a decade – simply because of disagreements
> between the group and al-Qa'ida's current leadership. A contrary

---

[6] Stephen W. Preston, *The Legal Framework for the United States' Use of Military Force Since
9/11* (Apr. 10, 2015), http://www.defense.gov/News/Speeches/Speech-View/Article/606662.

> interpretation of the statute would allow the enemy – rather than the President and Congress – to control the scope of the AUMF by splintering into rival factions while continuing to prosecute the same conflict against the United States.

*Id.*  Preston also explained that "[t]he President's authority to fight ISIL is further reinforced by the" 2002 AUMF because "[a]lthough the threat posed by Saddam Hussein's regime in Iraq was the primary focus of the 2002 AUMF, the statute, in accordance with its express goals, has always been understood to authorize the use of force for the related purposes of helping to establish a stable, democratic Iraq and addressing terrorist threats emanating from Iraq."  *Id.*

**B. Plaintiff's Military Service and Complaint**

Plaintiff joined the military in 2010.  Compl. for Decl. Relief, ECF No. 1 ("Compl.") ¶ 4. At the time his Complaint was filed, Plaintiff was a U.S. Army Captain deployed to Kuwait as an intelligence officer.  *Id.* ¶ 1.  He worked at the headquarters of the Commander of the Combined Joint Task Force-Operation Inherent Resolve, who oversees the United States counter-ISIL campaign in Iraq and Syria.  *Id.*

By Plaintiff's own account, he supported the United States taking military action against ISIL.  Plaintiff states that ISIL is "an army of butchers" and that "[t]heir savagery is sickening." Decl. of Nathan Michael Smith, ECF No. 1-3 ("Pl.'s Decl.") ¶ 4.  He states that "[w]hen President Obama ordered airstrikes in Iraq in August 2014, and in Syria in September 2014, I was ready for action.  In my opinion, the operation is justified both militarily and morally.  This is what I signed up to be a part of when I joined the military."  *Id.* ¶ 5.

Although he "cheer[ed] every airstrike and every setback for" ISIL, he also heard news accounts that led him to believe that "people at home were torn about whether President Obama should be carrying out this war without proper authorization."  *Id.* ¶ 6.  He stated that he had taken an oath to "preserve, protect, and defend the Constitution of the United States," and was

unsure how he could honor it when fighting a war, "even a good war," that the Constitution did not allow or Congress had not approved. *Id.* ¶ 7.  Plaintiff therefore brought this lawsuit "[t]o honor [his] oath." *Id.*

As summarized by Plaintiff, his lawsuit "seeks a declaration that President Obama's war against ISIS is illegal because Congress has not authorized it."  Compl. at 1.  Specifically, Plaintiff alleges that under the War Powers Resolution, sixty days after President Obama introduced U.S. armed forces into hostilities with ISIL in Iraq and Syria, he was required to obtain from Congress either a declaration of war or "a specific statutory authorization" for this use of force. *Id.* ¶¶ 24-25.  Plaintiff alleges that President Obama never sought such approval, and that neither the 2001 AUMF nor the 2002 AUMF constituted prior authorization. *Id.* ¶¶ 25, 31-37.  Plaintiff also claims that the Take Care Clause of the Constitution required President Obama to publish, within the sixty-day period specified by the War Powers Resolution, a "sustained legal justification to enable [Plaintiff] to determine whether his military actions as an officer [were] consistent with his oath." *Id.* ¶ 28.  As relief, Plaintiff requests that the Court declare that Operation Inherent Resolve violates the War Powers Resolution and the Take Care Clause and that, if Congress does not declare war or give the President specific authorization within the next sixty days, all United States armed forces must disengage from military action against ISIL. *Id.* at 13.

## II. LEGAL STANDARD

When a motion to dismiss a complaint under Rule 12(b)(1) is filed, a federal court is required to ensure that it has "the 'statutory or constitutional power to adjudicate [the] case[.]'" *Morrow v. United States*, 723 F. Supp. 2d 71, 77 (D.D.C. 2010) (emphasis omitted) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)).  "Federal courts are courts of

limited jurisdiction" and can adjudicate only those cases or controversies entrusted to them by the Constitution or an Act of Congress. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "In an attempt to give meaning to Article III's case-or-controversy requirement, the courts have developed a series of principles termed 'justiciability doctrines,' among which are standing . . . and the political question doctrine." *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984)). The Court begins with the presumption that it does not have subject matter jurisdiction over a case, *id.*, and Plaintiff bears the burden of establishing otherwise, *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007).

In determining whether there is jurisdiction, the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted). "Although a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (citations omitted).

### III. DISCUSSION

Defendant raises a number of jurisdictional grounds for dismissing Plaintiff's Complaint, but this Court need only address two: (A) Plaintiff does not have standing because the specific legal injury about which he complains is not sufficiently concrete or particularized, and (B) Plaintiff's claims raise non-justiciable political questions.

**A.  Standing**

The Court finds it appropriate to first take up the issue of whether Plaintiff has standing to bring this suit.  *See Am. Jewish Cong. v. Vance*, 575 F.2d 939, 943 (D.C. Cir. 1978) ("[W]e believe that when both standing and political question issues are before the court and neither has been resolved definitively in a context readily applicable to the case presented, the court should determine the question of standing first.").  On the specific facts of this case, and in particular due to the narrow and unique legal injury that Plaintiff asserts, the Court finds that Plaintiff lacks standing.

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy."  *Spokeo, Inc. v. Robins*, — U.S. —, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016).  To establish standing, Plaintiff bears the burden of demonstrating that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id*. (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  At the pleading stage, this requires Plaintiff to "'clearly . . . allege facts demonstrating' each element."  *Id*. (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).  The Court notes that the standing inquiry is "especially rigorous when reaching the merits of the dispute would force [the Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997).

The dispute in this case centers around the "'[f]irst and foremost'" element of standing: injury in fact.  *Spokeo*, 136 S. Ct. at 1547 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or

imminent, not conjectural or hypothetical.'" *Id*. at 1548 (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id*. (quoting *Lujan*, 504 U.S. at 560 n.1). For an injury to be "concrete," it "must be '*de facto*'; that is, it must actually exist." *Id.* (quoting Black's Law Dictionary 479 (9th ed. 2009)). "Concrete" is not "necessarily synonymous with 'tangible,'" and can include the "risk of real harm." *Id*. at 1549. That being said, the "bare procedural violation" of a statute, "divorced from any concrete harm," is not sufficient to establish injury in fact. *Id*.

As a starting point, Plaintiff's bare disagreement with, or simple uncertainty about the legality of, President Obama's decision to take military action against ISIL does not constitute an injury in fact. Such disagreement or uncertainty presents no "concrete" harm, nor is it "particularized" because it does not affect Plaintiff in any individual or particular way. It is well-established that "a bare assertion that the government is engaging in illegal or unconstitutional activity does not allege injury sufficient to confer standing." *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 799 (D.C. Cir. 1987). In other words, "the psychological consequence presumably produced by observation of conduct with which one disagrees," is not an injury in fact. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). From this baseline, it is Plaintiff's burden to clearly allege some additional concrete, particularized harm that the alleged violations caused or threaten to cause him.

The Court finds it useful to begin by explaining the injuries Plaintiff is *not* alleging, because Plaintiff does not allege the traditional types of injuries one might expect a service person challenging the legality of military action to allege. Plaintiff *does not* allege that he suffers any injury in the form of physical or emotional harms, or the risk thereof, associated with deployment to a theatre of combat. He also *does not* allege that he has been involuntarily forced

to participate in a military action in violation of his own constitutional rights or liberties.  And he *does not* allege that he has any moral or philosophical objections to the military action against ISIL.  Indeed, Plaintiff has no qualms about participating in a fight against ISIL, and his lawsuit does not seek to relieve him of his obligation to do so.  Plaintiff states that "[w]hen President Obama ordered airstrikes in Iraq in August 2014, and in Syria in September 2014, I was ready for action.  In my opinion, the operation is justified both militarily and morally.  *This is what I signed up to be a part of* when I joined the military."  Pl.'s Decl. ¶ 5 (emphasis added).  The relief Plaintiff seeks is to "*continue* fighting," Pl.'s Opp'n at 44 (emphasis added), but to be able to do so free of reservations regarding the legality of the Operation.

Defendant argued in his Motion to Dismiss that these more traditional types of service member injuries were not at issue in this case, and Plaintiff has not disputed this characterization of his claims.  Accordingly, the Court deems Plaintiff to have conceded that these are not the "injuries" that Plaintiff seeks to vindicate in this case, and the Court passes no judgment on whether a service member asserting such injuries would have standing to bring a similar claim. *See Hopkins v. Women's Div., Gen. Bd. of Glob. Ministries*, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded."); *Achagzai v. Broad. Bd. of Governors*, 109 F. Supp. 3d 67, 70 n.2 (D.D.C. 2015) (points not disputed in opposition to motion to dismiss conceded) (citing *Hopkins,* 238 F. Supp. 2d at 178); *Youming Jin v. Ministry of State Sec.*, 335 F. Supp. 2d 72, 82 n.7 (D.D.C. 2004) (applying this principle to arguments regarding the grounds for jurisdiction).

Instead, the Court discerns two different types of harms for which Plaintiff seeks relief. First, Plaintiff alleges that he "suffers legal injury because, to provide support for an illegal war, he must violate his oath to 'preserve, protect, and defend the Constitution of the United States.'" Compl. at 2.  In addition, Plaintiff alleges that he is at risk of being punished for disobeying legally-given orders.  Plaintiff argues, to some extent contradicting his first claim of injury, that he is "not fully confident that the war against ISIS is illegal," Pl.'s Opp'n at 5, and that it was "impossible for [Plaintiff] to determine whether his present mission [was] inconsistent with his oath," Compl. ¶ 19.  In this position, Plaintiff contends that his oath and certain Supreme Court case law require him to disobey his military orders and refuse to fight.  Pl.'s Opp'n at 3. However, if Plaintiff disobeys those orders and it is later determined that he was wrong about the legality of the war, Plaintiff alleges that he risks injury in the form of court-martial, dishonorable discharge and other types of punishment.  *Id*. at 4.  For these reasons, Plaintiff "seek[s] an independent determination of this matter from the Court."  Compl. ¶ 19.

Although the Court admires Plaintiff's willingness to serve his country and the solemnity that he attaches to fulfilling his oath, the Court finds that the injuries he alleges are not sufficient to confer standing.  As discussed above, Plaintiff's bare desire to have this Court determine the legality of President Obama's actions is neither a concrete nor a particularized injury.  Plaintiff has attempted to move past this baseline by arguing that the oath- and military punishment-based injuries he has alleged, as outlined above, are sufficient to give him standing under three lines of authority.  The remainder of the Court's analysis on the standing issue—which the Court notes focuses primarily on the issue of concreteness, as opposed to particularity—demonstrates that Plaintiff was not in fact forced to suffer, or risk suffering, injuries under the reasoning of those authorities.  First, the Court does not find that Plaintiff was required, under his oath or Supreme

Court case law, to disobey his military orders.  He accordingly was not forced to face the risk of military punishment as he alleges.  Second, the Court finds that Plaintiff does not have standing under the so-called "oath of office" cases because he was not forced to either violate the Constitution or face some form of punishment.  Finally, the Court finds that Plaintiff cannot base his standing on cases in which service members were deemed to have standing to challenge the legality of the Vietnam War because those cases involved allegations and injuries not at issue in this case.  What is left is Plaintiff's bare desire to have the legality of Operation Inherent Resolve determined.  Such desire is insufficient to create standing.

### 1.  *Little v. Barreme* Does Not Require Plaintiff to Disobey Orders

First, Plaintiff seeks to base his standing on the Supreme Court case *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804).  Plaintiff argues that this case stands for the proposition that "military officers must disobey orders that are beyond the legal authorization of their commander-in-chief."  Pl.'s Opp'n at 4.  Plaintiff reads too much into *Little*.

*Little* concerned a 1799 non-intercourse law whereby Congress had authorized President John Adams to order his naval commanders to seize American merchant ships sailing *to* French ports, but had not authorized the seizure of ships sailing *from* French ports.  *Little*, 6 U.S. at 170. On orders from the Secretary of the Navy, one naval commander acted beyond the scope of this authorization and seized a ship sailing *from* a French port.  *Id*. at 171-72.  The owner of the seized vessel sued the commander.  *Id*. at 172.  Chief Justice John Marshall held that the commander was liable in damages to the owner of the vessel, and that the President's instructions to the commander were not a defense to that liability.  *Id*. at 179.  Justice Marshall explained that "the instructions cannot change the nature of the transaction, or legalize an act which without those instructions would have been a plain trespass."  *Id*.

As the Supreme Court has since explained, *Little* stands for the proposition that "a federal official [is] protected for action tortious under state law only if his acts were authorized by controlling federal law." *Butz v. Economou*, 438 U.S. 478, 490 (1978).[7] *Little* does not stand for the proposition, as Plaintiff argues, that military personnel have a *duty to disobey* orders they believe are beyond Congressional authorization. There is a significant difference between a holding that Presidential authorization for an act beyond Congressional authority does not *immunize* military personnel from tort liability under state law, and a holding that military personnel *must disobey* orders that they believe are beyond such authority. Plaintiff points the Court to no authority that has interpreted *Little* to stand for the latter proposition, and the Court has found none.

To the contrary, it appears well-settled in the post-*Little* era that there is no right, let alone a duty, to disobey military orders simply because one questions the Congressional authorization of the broader military effort.[8] *See U.S. ex rel. New v. Rumsfeld*, 448 F.3d 403, 411 (D.C. Cir. 2006) (in the context of challenging a military order that plaintiff alleged was given in violation of the United Nations Participation Act, holding that "nothing gives a soldier 'authority for a self-help remedy of disobedience'") (quoting *United States v. New*, 55 M.J. 95, 108 (C.A.A.F. 2001)); *United States v. Huet-Vaughn*, 43 M.J. 105, 114 (C.A.A.F. 1995) ("To the extent that

---

[7] To the extent that Plaintiff had argued—which he has not—that he might be sued for committing a tort in connection with his actions in support of Operation Inherent Resolve, and that he would suffer liability because his orders would not provide him immunity under the logic of *Little*, this alleged harm would be insufficient to confer standing because it is "conjectural and hypothetical," not "actual or imminent." *Lujan*, 504 U.S. at 560. Plaintiff fails to allege any action that he has taken that might constitute a tort, or that any legal claim based on such an action is imminent, let alone viable under modern law.

[8] Plaintiff's argument is all the more tenuous because, even if Plaintiff did have a duty to disobey orders where the broader military effort was not duly authorized, Plaintiff admits that he is "not fully confident that the war against ISIS is illegal." Pl.'s Opp'n at 5.

CPT Huet–Vaughn's acts were a refusal to obey an order that she perceived to be unlawful, the proffered evidence was irrelevant.  The so-called 'Nuremberg defense' applies only to individual acts committed in wartime; it does not apply to the Government's decision to wage war."); *see also New*, 55 M.J. at 109 ("The duty to disobey an unlawful order applies only to a positive act that constitutes a crime that is so manifestly beyond the legal power or discretion of the commander as to admit of no rational doubt of their unlawfulness.") (quoting *Huet-Vaughn*, 43 M.J. at 114).

Nor does the oath Plaintiff was required to swear as an officer in the Army change this outcome.  The modern oath for officers requires the officer to swear to "support and defend the Constitution."  5 U.S.C. § 3331.  Plaintiff argues that this oath reinforces his interpretation of *Little* and further requires him to disobey orders he believes may exceed congressional authorization.  Pl.'s Opp'n at 7-9.  Again, the Court disagrees.  An oath to "support" the Constitution does not "involve[ ] nebulous, undefined responsibilities for action in some hypothetical situations," but has instead "been interpreted to mean simply a commitment to abide by our constitutional system."  *Cole v. Richardson*, 405 U.S. 676, 684 (1972).  Although, as discussed below, such an oath may require Plaintiff to refrain from violating the Constitution, *see infra* § III.A.2, Plaintiff offers no real support for the extremely expansive and apparently novel interpretation of the officer's oath that would require disobedience of military orders based on an officer's legal interpretation of whether Congress had properly authorized the broader military effort.  Beyond the fact that there is no legal support for such a proposition, the Court finds persuasive Defendant's argument regarding the obvious and problematic practical consequences

such an interpretation would have on military effectiveness.[9]   Namely, that it would leave "individual service members to decide which orders to follow based on their individual assessment of" whether the order falls within prior Congressional authorizations for the use of military force.  Def.'s Reply at 20.

Because neither *Little* nor Plaintiff's oath can plausibly be read to *require* Plaintiff to disobey his orders, Plaintiff was not forced to experience or risk concrete and particularized harms associated with wrongful disobedience, such as court-martial or dishonorable discharge. In other words, Plaintiff had "an 'available course of action which subject[ed] [him] to no concrete adverse consequences'—he [could] obey the orders of the Commander–in–Chief." *Drake v. Obama*, 664 F.3d 774, 780 (9th Cir. 2011) (quoting *City of S. Lake Tahoe v. California Tahoe Reg'l Planning Agency*, 625 F.2d 231, 237 (9th Cir. 1980)) (finding no standing based on service member's alleged need to disobey orders from President Obama).  Doing so would have neither subjected Plaintiff to discipline, nor been unlawful.  *See* Dep't of Def., Law of War Manual, § 18.3.2.1 (May 2016) ("[S]ubordinates are not required to screen the orders of superiors for questionable points of legality, and may, absent specific knowledge to the contrary, presume that orders have been lawfully issued.").  The risk of military punishment for disobedience, therefore, does not give Plaintiff standing.

### 2.  Plaintiff Does Not Have Standing Under the "Oath of Office" Cases

Plaintiff also seeks to base his standing on "oath of office" cases.  These cases generally stand for the proposition that an official who has taken an oath to support the Constitution has

---

[9] Plaintiff relies on the fact that the officer's oath does not require officers to "obey the orders of the President," as does the oath sworn by enlisted personnel.  10 U.S.C. § 502.  However, the Court does not interpret the absence of a requirement to *obey* the orders of the President as an affirmative obligation to *disobey* those orders under the circumstances facing Plaintiff.

standing to challenge a government action if he or she is then forced to choose between violating

the Constitution and facing concrete harm. Plaintiff relies primarily on *Board of Education of*

*Central School District No. 1 v. Allen*, 392 U.S. 236 (1968). In *Allen*, school boards challenged

the constitutionality of a law requiring local public school authorities to lend textbooks free of

charge to all students in grades seven through twelve, regardless of whether they attended private

schools. *Id*. at 238. The school board-appellants believed that their doing so would violate the

Establishment Clause. *Id*. at 240. In a footnote, the Supreme Court noted that

> Appellees do not challenge the standing of appellants to press their
> claim in this Court. Appellants have taken an oath to support the
> United States Constitution. Believing s 701 to be unconstitutional,
> they are in the position of having to choose between violating their
> oath and taking a step—refusal to comply with s 701—that would
> be likely to bring their expulsion from office and also a reduction in
> state funds for their school districts. There can be no doubt that
> appellants thus have a 'personal stake in the outcome' of this
> litigation.

*Id*. at 241 n.5.

As an initial matter, the Court notes that it finds persuasive the opinions of various Courts

of Appeal that have questioned whether such "oath taker" standing would still be considered

sufficiently "concrete" under modern Supreme Court standing precedent. For example, in a case

where a plaintiff service member alleged that he had standing to challenge the constitutionality

of the President's eligibility for office because he and other service members were "required to

take an oath in which they swear to support and defend the Constitution of the United States and

obey the orders of the officers appointed over them," the Ninth Circuit found that plaintiff's

"injuries [were] not sufficiently concrete to establish Article III standing, regardless of his

military oath." *Drake*, 664 F.3d at 780. The court held that "an oath taker's claims are, under

contemporary jurisprudence, 'abstract constitutional grievances' insufficient to meet the

requirements of Article III." *Id.* (quoting *City of S. Lake Tahoe*, 625 F.2d at 238); *see also Crane v. Johnson*, 783 F.3d 244, 253 (5th Cir. 2015) (holding that plaintiffs lacked standing where customs enforcement agents "assert[ed] that they have suffered an injury in fact because enforcing [an executive immigration program] would require them to violate their oaths to uphold the laws of the United States" because "the agent's subjective belief that complying with the Directive will require him to violate his oath is not a cognizable injury"). Like the alleged injuries of the plaintiffs in these cases, the injury alleged by Plaintiff here is abstract, not concrete.

Moreover, even if Plaintiff's belief that he was violating his oath was sufficiently concrete to constitute an injury in fact under modern law, Plaintiff's reliance on *Allen* would still be misplaced. Plaintiffs in *Allen* believed that the action *they were being required to take* violated the Constitution. By contrast, Plaintiff in this case alleges that President Obama has violated a statute, the War Powers Resolution, by not seeking Congressional authorization for military actions against ISIL, and violated the Take Care Clause of the Constitution by failing to publish an explanation of the legal justifications for these actions. Even accepting these allegations as true, Plaintiff fails to allege that *he*, like the plaintiffs in *Allen*, is being asked to undertake any action that would be a violation of the Constitution and therefore his oath.

In this sense, this case is similar to *Rodearmel v. Clinton*, 666 F. Supp. 2d 123 (D.D.C. 2009). In *Rodearmel*, a United States Foreign Service Officer filed suit challenging the constitutionality of Hillary Clinton's appointment as Secretary of State under the Ineligibility Clause. *Id.* at 126. The Officer argued that he had standing because he could not serve under Clinton without violating his oath to support and defend the Constitution. *Id.* at 129-30. Like Plaintiff in this case, the Officer in *Rodearmel* relied on *Allen*. *Id.* The court rejected this

argument because, in contrast to the plaintiffs in *Allen*, the plaintiff in *Rodearmel* had "not alleged that he has been required to take any action that he believes is *itself* unconstitutional and that would therefore lead him to violate his oath of office." *Id*. at 130 (emphasis added).  The court went on to explain that whereas in *Allen*, "plaintiffs either had to take an action that they believed violated the Constitution or risk a concrete injury," the *Rodearmel* plaintiff "merely allege[d] that 'serving under, taking direction from, and reporting to' Clinton would be contrary to his oath of office without alleging the specific constitutional violation that he believes *he would be committing* by remaining under her supervision." *Id*. (emphasis added).  The court held that even "[a]ssuming Clinton unconstitutionally holds office as Secretary of State, it does not follow that a Foreign Service Officer generally serving under, taking direction from and reporting to Clinton performs an unconstitutional act thereby . . . ." *Id*. at 131.

The Court finds this reasoning applicable and persuasive in this case.  The Court acknowledges that Plaintiff questions the legality of, or congressional authorization for, an enterprise he was involved with—Operation Inherent Resolve.  However, even assuming that Plaintiff is correct that the President violated the War Powers Resolution, it does not follow that any act Plaintiff himself was asked to take as an intelligence officer in that Operation would itself be unconstitutional.  Even if the logic of *Allen* were expanded to cover situations where a plaintiff had to choose between violating a *statute* (here, the War Powers Resolution) and suffering some concrete harm, the alleged violation of the War Powers Resolution in this case is based solely on the alleged actions, or lack thereof, of President Obama, not Plaintiff.  The same is true with regard to the alleged violation of the Take Care Clause.  Plaintiff violates neither by participating in Operation Inherent Resolve.  Like the plaintiff in *Rodearmel*, and unlike the plaintiffs in *Allen*, Plaintiff here is at least one step removed from these allegations of illegality

or unconstitutionality.  Even accepting his allegations as true, he is not himself being ordered to violate the Constitution, and therefore his oath.

Finally, Plaintiff cannot ground his standing on the "oath of office" cases for an additional reason.  In *Allen* and its progeny, plaintiffs firmly believed and alleged that the actions they would be required to take violated their oaths.  Plaintiff, on the other hand, is not certain.  He complains that the President has made it "impossible for [him] to determine whether his present mission [was] inconsistent with his oath."  Compl. ¶ 19.  Accordingly, Plaintiff "seek[s] an independent determination of this matter from the Court," *id.*, because he wants to be able to "continue fighting without confronting the dilemma imposed upon [him] by *Little* and [his] oath of office while this Court, and appellate tribunals, deliberate on the legal merits of [his] claims," Pl.'s Opp'n at 44.  This aspect of uncertainty related to his oath sets Plaintiff apart from past "oath of office" plaintiffs.  The distinction is legally significant, because "[i]f there is one concept to be gained from the Supreme Court decisions on standing, it is that a litigant, to have standing, must have a stake in the controversy at issue, i.e., he himself must perceptibly win or lose depending on the outcome."  *Harrington v. Bush*, 553 F.2d 190, 209 (D.C. Cir. 1977).  A mere interest in "having the question of the legality of certain . . . activities decided one way or the other" is insufficient.  *Id.*  The particular oath-based interest Plaintiff has pled does not meet these standards.  Plaintiff's interest, in knowing *whether* participation in Operation Inherent Resolve is consistent with his oath, would be satisfied regardless of the Court's determination of the legality of that operation.  It cannot, accordingly, be the basis of Plaintiff's standing.  For all of these reasons, Plaintiff does not allege a cognizable injury in fact under the logic of the "oath of office" cases.

### 3.   Plaintiff Does Not Allege Physical or Individual Liberty-Based Injuries

Finally, the Court rejects Plaintiff's argument that the "decisions in cases brought by service members challenging the Vietnam War further confirm [Plaintiff's] standing."  Pl.'s Opp'n at 12.  To be sure, such cases do stand for the proposition that service men and women ordered into a war that they contend is illegal may have standing to challenge that war, and the Court finds the reasoning of those cases logical and persuasive.  *See Berk v. Laird*, 429 F.2d 302 (2d Cir. 1970); *Massachusetts v. Laird*, 451 F.2d 26 (1st Cir. 1971).  The Court does not question as a general matter the apparent assumption of certain courts that service members may be appropriate parties to challenge the legality of military action that they claim endangers them.

These cases do not, however, address the novel legal injury put forth by Plaintiff.  In the cases referred to by Plaintiff, plaintiff-service members claimed that they were being forced to fight in violation of their constitutional rights, and the injuries that they alleged were the deprivation of liberty and the risk of injury or death.  *See Berk*, 429 F.2d at 304 (soldier ordered to dispatch to Vietnam alleging violations of his constitutional rights could bring suit challenging legality of war where "the complaint can be construed as putting in controversy his future earning capacity, which serious injury or even death might diminish by an amount exceeding $10,000"); *Massachusetts v. Laird*, 451 F.2d at 28 (soldiers serving in Southeast Asia had standing to challenge Vietnam War where "[t]hey allege[d] that their forced service in an undeclared war is a deprivation of liberty in violation of the due process clause of the Fifth Amendment").

Plaintiff in this case has made it abundantly clear that these are not the legal injuries for which he is seeking redress.  Although Plaintiff claims that "[t]he injuries that threaten [Plaintiff] are *also* concrete," Pl.'s Opp'n at 12 (emphasis added), he does not seek to base his standing on

the fact that he risks bodily or individual liberty-based injuries as alleged by past service member plaintiffs.  In fact, the relief sought by Plaintiff would not prevent the risk of these injuries.  To the contrary, Plaintiff defines the relief he seeks as being able to "continue fighting," but simply "without confronting the dilemma imposed upon [him] by *Little* and [his] oath of office."  Pl.'s Opp'n at 44.  As discussed earlier in this opinion, Defendant prominently raised the omission of these more traditional types of alleged injuries in his Motion to Dismiss, and Plaintiff did not dispute it.  These cases are accordingly inapposite and do not support Plaintiff's claim that the "dilemma" he faces constitutes an injury-in-fact.[10]

In sum, the Court concludes that the "injuries" upon which Plaintiff grounds his claim do not constitute "injury in fact" as required to support Article III standing.  Plaintiff argues that his oath of office, in combination with the Supreme Court's ruling in *Little*, place him in an untenable "dilemma" that can only be resolved by this Court's deciding the lawfulness of the President's actions.  The Court disagrees.  Neither *Little* nor Plaintiff's oath require him to disobey his orders.  Nor is Plaintiff forced to choose between violating the Constitution or suffering concrete harm, like plaintiffs in past cases where "oath of office" standing has been accepted.  The Court draws no conclusions as to the standing of a service member ordered into a war he or she believes is unlawful where the soldier's claim is based on his own constitutional

---

[10] For this reason, the Court's holding is not at odds with the statement in *Campbell v. Clinton*, 52 F. Supp. 2d 34, 43 n.8 (D.D.C. 1999), *aff'd*, 203 F.3d 19 (D.C. Cir. 2000), quoted by Plaintiff, that "[c]ounsel for the President appears to have acknowledged that an *individual* alleging personal injury from the President's alleged failure to comply with the War Powers Clause or the War Powers Resolution, as for instance a serviceperson who has been sent to carry out the air strikes against the Federal Republic of Yugoslavia, would have standing to raise these claims." In this case, the Court has simply found that the individual service member plaintiff has *not* "alleg[ed] personal injury from the alleged failure."  *Id.*

rights, individual liberties, physical or emotional well-being, or other injuries.  This case simply does not present those questions.[11]

### B.  The Political Question Doctrine

The Court also finds that dismissal is appropriate under the political question doctrine. The political question doctrine is "essentially a function of the separation of powers."  *Baker v. Carr*, 369 U.S. 186, 217 (1962).  The doctrine "'excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch.'"  *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 840 (D.C. Cir. 2010) (quoting *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986)).  Although the contours of the doctrine are "murky and unsettled," *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 803 n.8 (D.C. Cir. 1984) (Bork, J., concurring), a case is said to present a political question if it involves:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of

---

[11] The Court does not rest its holding on the fact that Plaintiff has returned from his tour of duty since this Complaint was filed.  In his Reply, Defendant argues that this renders Plaintiff's standing "even more tenuous."  Def.'s Reply at 14.  But "[s]tanding is assessed as of the time a suit commences."  *Chamber of Commerce v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011) (quoting *Del Monte Fresh Produce Co. v. United States,* 570 F.3d 316, 324 (D.C. Cir. 2009)). The parties do not dispute that, at the time the suit was commenced, Plaintiff was on his tour of duty.  To the extent Defendant claims Plaintiff's return moots his claims, the Court finds that Plaintiff's claims would have been justiciable under the "capable of repetition, yet evading review" doctrine.  A tour of duty is by its nature too short a period during which to fully litigate Plaintiff's claim "prior to its cessation," and there is a "reasonable expectation" that Plaintiff could be called back for another tour supporting the same Operation.  *Conyers v. Reagan*, 765 F.2d 1124, 1128 (D.C. Cir. 1985).  Plaintiff is a career officer, has already served two tours, and claims to be a prime candidate for another tour with Operation Inherent Resolve.  Pl.'s Opp'n at 14.  That Operation is still ongoing, and the Court has no reason to conclude that it will end in the near future.  *Conyers*, 765 F.2d at 1128 (claim was moot because military action complained of had itself ceased).

> a court's undertaking independent resolution without expressing
> lack of the respect due coordinate branches of government; or [5] an
> unusual need for unquestioning adherence to a political decision
> already made; or [6] the potentiality of embarrassment from
> multifarious pronouncements by various departments on one
> question.

*Baker*, 369 U.S. at 217.  "To find a political question, [a court] need only conclude that one

factor is present, not all."  *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005).

"Disputes involving foreign relations, such as the one before [the Court], are

'quintessential sources of political questions.'"  *El-Shifa*, 607 F.3d at 841 (quoting *Bancoult v.

McNamara*, 445 F.3d 427, 433 (D.C. Cir. 2006)).  "Yet it is error to suppose that every case or

controversy which touches foreign relations lies beyond judicial cognizance."  *Id.* (quoting

*Baker*, 369 U.S. at 211).  "Even in the context of military action, the courts may sometimes have

a role."  *Id.* (citing *Gilligan v. Morgan*, 413 U.S. 1, 11-12 (1973)).  "Therefore, we must conduct

'a discriminating analysis of the particular question posed' in the 'specific case' before the court

to determine whether the political question doctrine prevents a claim from going forward."  *Id.*

(quoting *Baker,* 369 U.S. at 211).  The presence of a political question "turns not on the nature of

the government conduct under review but more precisely on the question the plaintiff raises

about the challenged action."  *Id.* at 842.

Accordingly, the Court begins by clarifying the precise questions posed by Plaintiff's

claims.  Plaintiff's claims are premised on the notion that Congress has not previously authorized

the use of force against ISIL.  Defendant disputes this.  Resolving this dispute would require the

Court to determine whether the legal authorizations for the use of military force relied on by

President Obama—the 2001 and 2002 AUMFs—in fact authorize the use of force against ISIL.

With regard to the 2001 AUMF, the Court would have to determine whether the President is

correct that ISIL is among "those nations, organizations, or persons" that "planned, authorized,

committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons," and that Operation Inherent Resolve represents "necessary and appropriate force" against that group.  Pub. L. No. 107–40, § 2(a).  With regard to the 2002 AUMF, the Court would have to determine whether the President is correct that operations against ISIL are "necessary and appropriate in order to . . . defend the national security of the United States against the continuing threat posed by Iraq."  Pub. L. No. 107-243, § 3(a)(1).  For the reasons set out below, the Court finds that these are political questions under the first two *Baker* factors: the issues raised are primarily ones committed to the political branches of government, and the Court lacks judicially manageable standards, and is otherwise ill-equipped, to resolve them.

There can be "no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government."  *Schneider*, 412 F.3d at 194; *see also Gilligan*, 413 U.S. at 10 ("It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches . . . [than the] complex, subtle, and professional decisions as to the . . . control of a military force . . . ."); *Luftig v. McNamara*, 373 F.2d 664, 665-66 (D.C. Cir. 1967) ("The fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matters are plainly the exclusive province of Congress and the Executive.").

Questions of statutory construction and interpretation, however, are committed to the Judiciary, and Plaintiff argues that this is a "garden-variety statutory construction case," that presents "straightforward problems of statutory interpretation."  Pl.'s Opp'n at 1, 16.  The principle that resolving questions of statutory interpretation, and the constitutionality of statutes,

is a task committed to the Judiciary was recently reiterated by the Supreme Court in *Zivotofsky ex rel. Zivotofsky v. Clinton*, — U.S. —, 132 S. Ct. 1421 (2012).  In *Zivotofsky*, Congress had enacted a statute providing that Americans born in Jerusalem could elect to have "Israel" listed as their place of birth on their passports, but the State Department declined to enforce the law. *Id*. at 1424.  When the State Department refused to issue him a passport with Israel listed as his place of birth, the petitioner in *Zivotofsky* brought suit against the Secretary of State seeking to vindicate his statutory right.  *Id*. at 1425-26.  The District Court found that the case presented a non-justiciable political question and the Court of Appeals affirmed.  *Id*. at 1426.  The Supreme Court disagreed, holding that "[t]he courts are fully capable of determining whether this statute may be given effect, or instead must be struck down in light of authority conferred on the Executive by the Constitution."  *Id*. at 1425.  Specifically, the Supreme Court held that "[t]he federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be.  Instead, Zivotofsky requests that the courts enforce a specific statutory right.  To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional.  This is a familiar judicial exercise."  *Id*. at 1427.

Plaintiff's attempts to analogize his case to *Zivotofsky* are strained.  Although, as in *Zivotofsky*, statutes are *involved* in this case—in particular, the War Powers Resolution, the 2001 AUMF and the 2002 AUMF—this case does not present nearly the same fundamental legal issues as were at issue in *Zivotofsky*.  The questions posed in this case go significantly beyond interpreting statutes and determining whether they are constitutional.  Plaintiff asks the Court to second-guess the Executive's *application* of these statutes to specific facts on the ground in an ongoing combat mission halfway around the world.  For example, the Court is not asked simply

to "interpret" the 2001 AUMF, or to determine its constitutionality.  It is asked to determine whether the President is correct that ISIL, as it exists today, is an appropriate target under that resolution based on the nature and extent of ISIL's relationship and connections with the terrorist organization that the President has determined was responsible for the September 11, 2001 attacks.  The Court would also have to go further than simply "interpreting" the 2002 AUMF.  It would have to determine whether the President is correct that the ongoing military action against ISIL is in fact "necessary and appropriate in order to . . . defend the national security of the United States against the continuing threat posed by Iraq."  Pub. L. No. 107-243, § 3(a)(1).

The reality, then, is more nuanced than Plaintiff suggests.  Plaintiff's claims raise mixed questions of both discretionary military judgment *and* statutory interpretation.  The Court does not read *Zivotofsky* as foreclosing the application of the political question doctrine under this scenario.  *See Ali Jaber v. United States*, 155 F. Supp. 3d 70, 80 (D.D.C. 2016) (distinguishing the "purely legal issue[ ]" in *Zivotofsky*—"whether a statute is unconstitutional on its face"— from a case where "plaintiffs seek a judicial determination that a particular action by the Executive violated domestic and international law, *i.e.*, a quintessential mixed question of law and fact").  Rather, under the particular facts of this case, the Court determines that dismissal under that doctrine is in fact warranted for three reasons.

First, certain aspects of the questions posed by this case are indisputably and completely committed to the political branches of government.  Both the 2001 and 2002 AUMFs authorize only that force that the President determines is "necessary and appropriate."  Pub. L. No. 107–40, § 2(a); Pub. L. No. 107-243, § 3(a)(1).  The necessity and appropriateness of military action is precisely the type of discretionary military determination that is committed to the political branches and which the Court has no judicially manageable standards to adjudicate.

Second, whatever factual questions are raised by Plaintiff's claims are not of the type that the Court is well-equipped to resolve.  Instead, the particular questions presented in this case "require judicial inquiry into sensitive military matters" about which "[t]he Court lacks the resources and expertise (which are accessible to the Congress) to resolve disputed questions of fact concerning."  *Crockett v. Reagan*, 558 F. Supp. 893, 898 (D.D.C. 1982), *aff'd*, 720 F.2d 1355 (D.C. Cir. 1983) (dismissing claim that the President violated the War Powers Resolution under the political question doctrine, holding that "[t]he subtleties of factfinding in this situation should be left to the political branches."); *Crockett v. Reagan*, 720 F.2d 1355, 1356 (D.C. Cir. 1983) (affirming the trial court's reasoning in dismissing the case because it "did not have the resources or expertise to resolve the particular factual disputes involved in this case").

Based on the pleadings thus far alone, the Court can easily discern that this case raises factual questions that are not of a type the Court is equipped to handle with traditional judicially manageable standards.  The President and Department of Defense officials apparently believe that ISIL is connected with al Qaeda and that, despite public rifts, some allegiances between the groups persist and ISIL continues to pursue the same mission today as it did before allegedly splintering from al Qaeda.  Plaintiff disputes these factual assertions, relying on an affidavit from scholars of Islamic Law that argue that as of today, the groups are in fact sufficiently distinct, and potentially even antagonistic, that they can no longer be viewed as the same terrorist organization.  Resolving this dispute would require inquiries into sensitive military determinations, presumably made based on intelligence collected on the ground in a live theatre of combat, and potentially changing and developing on an ongoing basis.  *See Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 45 (D.D.C. 2010) ("The difficulty that U.S. courts would encounter if they were tasked with 'ascertaining the 'facts' of military decisions exercised thousands of miles

from the forum, lies at the heart of the determination whether the question [posed] is a 'political' one.'") (quoting *DaCosta v. Laird*, 471 F.2d 1146, 1148 (2d Cir. 1973)).

Finally, an additional factor makes judicial intervention particularly inappropriate on the specific facts of this case.  Unlike the situation presented in *Zivotofsky,* the Court in this case is not presented with a dispute between the two political branches regarding the challenged action. In fact, Congress has repeatedly provided funding for the effort against ISIL.  For example, on November 10, 2014, President Obama sent a letter to the Speaker of the House of Representatives requesting that Congress consider proposed amendments to the 2015 Budget to provide funding for Operation Inherent Resolve.  The letter explained that "[t]hese amendments would provide $5.6 billion for OCO activities to degrade and ultimately defeat the Islamic State of Iraq and the Levant (ISIL) -- including military operations as part of Operation Inherent Resolve."[12]  President Obama also attached a letter from the Director of the Office of Management and Budget, which explained in some detail the military operations that the additional budget would be used to fund.  *Id.*  In December 2014, Congress passed the Consolidated and Further Continuing Appropriations Acts of 2015, Pub. L. No. 113-235, 128 Stat 2130 (2014), in which it appropriated the funds the President had sought.

The President's proposed budget for 2016 also requested funds to conduct Operation Inherent Resolve,[13] and Congress again appropriated the vast majority of the requested funds. Consolidated Appropriations Act, 2016, Public. L. No. 114-113, 129 Stat. 2242 (2015).  The

---

[12] Letter from President Obama to the Speaker of the House of Representatives (Nov. 10, 2014), https://www.whitehouse.gov/sites/default/files/omb/assets/budget_amendments/amendment_11_10_14.pdf.
[13] Office of Mgmt. & Budget, Exec. Office of the President, Appendix: Budget of the U.S. Government Fiscal Year 2016 312-13, 319-39 (2015), https://www.white house.gov/sites/default/files/omb/budget/fy2016/assets/appendix.pdf.

Explanatory Statement for the 2016 Appropriations Act that appropriated these funds stated that "[t]he rise of the Islamic State of Iraq and the Levant (ISIL)" serves as a reminder that "it is more important than ever to provide the funding and resources necessary to ensure that the military and Intelligence Community are able to detect and disrupt developing threats."[14]  It also stated that the Act "moves funding . . . to provide additional funding for the Army, Navy, Marine Corps, and Air Force to conduct counter-ISIL operations."  *Id.*  In addition to this funding, Defendant also cites the National Defense Authorization Acts for Fiscal Years 2015 and 2016, each of which addresses to some extent the threat posed by ISIL, and also notes that during the period Operation Inherent Resolve has been ongoing, Congress has held numerous hearings and received extensive reporting on the Operation.  Def.'s Mot. at 15-17.

Plaintiff has not pointed the Court toward any action that Congress has taken since the beginning of Operation Inherent Resolve that would indicate that Congress believes that further specific authorization (beyond the 2001 and 2002 AUMFs relied on by President Obama in his communications with Congress) is required for the Operation under the War Powers Resolution. Instead, both Plaintiff and Amici Curiae argue extensively that these congressional actions and inactions do not constitute "specific authorization" for military action against ISIL under the War Powers Resolution.  Although Defendant briefly disputes this point, the Court need not resolve this dispute because it goes to the *merits* of Plaintiff's claims, not their *justiciability*.[15]  The

---

[14] Consolidated Appropriations Act, 2016 Committee Print of the H. Comm. on Appropriations, Explanatory Statement, 566, Pub. L. No. 113-114 (2015), https://www.gpo.gov/fdsys/pkg/CPRT-114HPRT98155/pdf/CPRT-114HPRT98155.pdf.

[15] Because the Court dismisses Plaintiff's claims on standing and political question grounds, the Court declines to consider Defendant's secondary argument that these actions could independently serve as authorization under the War Powers Resolution.  Def.'s Opp'n at 28. Accordingly, the Court also declines to consider Defendant's argument that, to the extent section

Congressional budget activity cited above by Defendant, and relied on by the Court, demonstrates that the Court can discern no impasse or conflict between the political branches on the question of whether ISIL is an appropriate target under the AUMFs cited by the President as authority for Operation Inherent Resolve.[16]

This lack of conflict is relevant to the *justiciability* of Plaintiff's claims under the political question doctrine because judicial intervention into military affairs is particularly inappropriate when the two political branches to whom war-making powers are committed are not in dispute as to the military action at issue. *See Crockett*, 720 F.2d at 1356-57 (affirming dismissal of case challenging the President's use of military force under the War Powers Resolution on political question grounds because "Congress had taken no action which would suggest that it viewed our involvement in El Salvador as subject to the WPR"); *Crockett*, 558 F. Supp. at 899 ("Certainly, were Congress to pass a resolution to the effect that a report was required under the WPR, or to the effect that the forces should be withdrawn, and the President disregarded it, a constitutional impasse appropriate for judicial resolution would be presented."); *U.S. ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 97 (D.D.C. 2004), *aff'd*, 448 F.3d 403 (D.C. Cir. 2006) ("Petitioner raises a question of the allocation of war-making power between the political branches . . . . There is, however, no conflict between the branches on this matter . . . . When no evidence of such a

---

8(a) of the War Powers Resolution would require more specific authorization, it is unconstitutional. *Id.* at 29 n.47.

[16] The Court's observation that the political branches have not reached an impasse regarding the President's assertion of authorization to fight ISIL under the 2001 and 2002 AUMFs is also not shaken by Plaintiff's arguments about the legislative history of the 2001 AUMF and the National Defense Authorization Act for the Fiscal Year 2012.  Such history occurred before Operation Inherent Resolve was initiated and although potentially relevant to the merits of Plaintiff's case—whether ISIL is in fact an appropriate target under prior AUMFs—is not relevant to the current absence of conflict between the political branches regarding the authorization of Operation Inherent Resolve.

dispute even exists and, by all appearances, the executive and legislative branches agreed in this instance that there was no need for congressional approval, it would be most inappropriate for the Court to 'undertak[e] independent resolution [of the issue] without expressing lack of the respect due coordinate branches of government.'") (quoting *Baker*, 369 U.S. at 217); *Lowry v. Reagan*, 676 F. Supp. 333, 341 (D.D.C. 1987) (dismissing War Powers Resolution claim under the political question doctrine, but holding that "if Congress had enacted a joint resolution stating that 'hostilities' existed in the Persian Gulf for purposes of section 4(a)(1) of the War Powers Resolution [and] the President still refused to file a section 4(a) report, this Court would have been presented with an issue ripe for judicial review"); *Zivotofsky*, 132 S. Ct. at 1433 (Sotomayor, J., concurring) ("[I]t may be appropriate for courts to stay their hand in cases implicating delicate questions concerning the distribution of political authority between coordinate branches until a dispute is ripe, intractable, and incapable of resolution by the political process."); *Goldwater v. Carter*, 444 U.S. 996 (1979) (Powell, J., concurring) ("The Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse."); *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 211 (D.C. Cir. 1985) (Ginsburg, J., concurring) ("Congress has formidable weapons at its disposal—the power of the purse and investigative resources far beyond those available in the Third Branch.  But no gauntlet has been thrown down here by a majority of the Members of Congress.  On the contrary, Congress expressly allowed the President to spend federal funds to support" the military actions challenged).

The courts cited above have recognized, as this Court does, that Congress is vested with considerable power to restrain the President in the conduct of military operations.  *See Schneider*, 412 F.3d at 198 ("If the executive in fact has exceeded his appropriate role in the constitutional

scheme, Congress enjoys a broad range of authorities with which to exercise restraint and balance," including withholding funding); *Massachusetts v. Laird*, 451 F.2d at 34 ("When the executive takes a strong hand, Congress has no lack of corrective power."); *Ange v. Bush*, 752 F. Supp. 509, 514 (D.D.C. 1990) ("Congress possesses ample powers under the Constitution to prevent Presidential overreaching, should Congress choose to exercise them."). Such powers may not always be sufficient, and judicial intervention may be necessary when they fail. But in this case, where these powers have not been exercised and there does not appear to be any disagreement between the two political branches as to the legality of a live military operation, the Court finds it inappropriate to inject itself into these affairs.[17]   In sum, the Court finds that dismissal under the political question doctrine is appropriate.

Accordingly, the Court will dismiss Plaintiff's claims for two independent reasons. First, Plaintiff lacks standing. The "injuries" upon which Plaintiff grounds his claims do not constitute "injury in fact" as required to support Article III standing. Second, Plaintiff's claims raise non-justiciable political questions. This case raises questions that are committed to the political

---

[17] The Court's decision is not altered by the "supplemental" authorities Plaintiff filed wherein judges of this District have determined that courts have a role to play in determining when hostilities have ended for the purposes of habeas corpus relief for detainees under the 2001 AUMF. *See Al Warafi v. Obama*, No. CV 09-2368 (RCL), 2015 WL 4600420 (D.D.C. July 30, 2015), *order vacated, appeal dismissed* (Mar. 4, 2016); *Razak v. Obama*, 174 F. Supp. 3d 300 (D.D.C. 2016), *decision vacated, appeal dismissed* (Oct. 5, 2016). Those courts were not asked to declare that an ongoing military operation, about which there appears to be no dispute between Congress and the President, was "illegal." They were asked to determine whether an individual should be accorded habeas corpus relief because his detainment had become illegal. This is a far more traditional and appropriate judicial role, which does not raise the same separation of powers issues present in this case. *See El-Shifa*, 607 F.3d at 848 ("[T]he political question doctrine does not preclude judicial review of prolonged Executive detention predicated on an enemy combatant determination because the Constitution specifically contemplates a judicial role in this area.").

branches of government.  The Court is not well-equipped to resolve these questions, and the political branches who are so-equipped do not appear to be in dispute as to their answers.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's [9] Motion to Dismiss and DISMISSES Plaintiff's Complaint.  Plaintiff has not alleged an injury in fact sufficient for Article III standing, and his claims present non-justiciable political questions.  An appropriate Order accompanies this Memorandum Opinion.

Dated: November 21, 2016

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge
